UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| SHELLY D. PARHAM, individually, and VICTOR HINES III, as independent administrator of, and on behalf of, the ESTATE OF MARCUS JOHNSON,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>CITY OF BURKBURNETT; and DANIEL C. ELBAUM,<br><br>　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.<br>7:17-CV-00036-M |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

> This is a tragic unnecessary case of suicide resulting from flagrant violation of constitutional rights. The Defendants arrested and incarcerated Marcus Johnson, a young man in his early twenties. Officer Daniel Elbaum was well aware of Marcus's suicidal tendencies and propensity to hurt himself. Even so, the Defendants chose not to monitor Marcus and assure that he did not commit suicide. Instead, the Defendants chose to ignore Marcus, and leave him alone, locked in a cell, for about two hours. Not surprisingly, Marcus committed suicide, alone, isolated, and with no one to help.



TO THE HONORABLE JUDGE OF SAID COURT:

The Plaintiffs file this complaint and for cause of action will show the following. The Plaintiffs intend that this pleading amend, and thus replace, the Plaintiffs' Original Petition and Request for Disclosure filed in the 89th District Court in Wichita County, Texas.

Parties

1. Plaintiff Shelly D. Parham ("Ms. Parham") is a natural person who resides and did reside in Texas at all relevant times. Ms. Parham was Marcus Johnson's legal and biological mother. Marcus Johnson is referred to herein at times as "Mr. Johnson" and/or "Marcus."

2. Plaintiff Victor Hines III ("Mr. Hines"), as the Independent Administrator of the Estate of Marcus Johnson, acts in that capacity and files this lawsuit asserting claims in that capacity and on behalf of the estate. Letters of independent administration were issued to Mr. Hines on or about January 19, 2017, in Cause Number 31158-F, in the County Court at Law Number 2 of Wichita County, Texas, in a case styled *In the Matter of the Estate of Marcus Donavon Johnson, Deceased.*

3. Defendant City of Burkburnett ("City of Burkburnett") is a Texas incorporated municipality/city. City of Burkburnett was served with process and has made an appearance in this case. City of Burkburnett acted or failed to act at all relevant times through its employees, agents, representatives, and/or police officers and is liable for such actions and/or to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Rehabilitation Act, and the Americans with Disabilities Act).

4. Defendant Daniel C. Elbaum ("Mr. Elbaum" or "Officer Elbaum") is a natural person who was served with process and has made an appearance in this case. Mr. Elbaum is being sued in his individual capacity and acted at all relevant times under color of state law. Mr.

Elbaum was employed as a City of Burkburnett police officer at all such times and acted or failed to act in the course and scope of his duties.

## Jurisdiction

5.       The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and federal statutes including but not necessarily limited to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act. The Plaintiffs do not, by including the following sentence, assert, stipulate, or allege any state law claims.  However, to the extent any such claims are alleged or construed to be alleged in this pleading, the court has supplemental jurisdiction over any such claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims within the court's original jurisdiction that they and the claims within the court's original jurisdiction arise from a common nucleus of operative fact and form part of the same case or controversy under Article III of the United States Constitution.

6.       The court has person jurisdiction over the City of Burkburnett because it is a Texas municipality.  The court has personal jurisdiction over Daniel C. Elbaum because he resides in and is a citizen of Texas.

## Venue

7.       Venue is proper in the Wichita Falls Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because it is the division and district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

<u>Factual Allegations</u>

8.      The Plaintiffs provide in this Factual Allegations section the general substance of certain factual allegations.   The Plaintiffs do not intend that this section provide in detail, or necessarily in chronological order, any or all allegations.   Rather, the Plaintiff's intend that this section merely provide the Defendants fair notice of the general nature and substance of the Plaintiffs' allegations.

9.      Marcus was born in 1993, in Oklahoma City, to Shelly Parham and Kendrick Johnson.   He attended Anadarko School, and lived in Anadarko until moving to Wichita Falls in about December 2014.   Marcus was severely emotionally and mentally troubled, but he battled those issues the best he could.   He was a member of, and active in at times, a Wichita Falls church. Marcus enjoyed fishing, writing, and helping others.   He wanted to study psychology and help people who were mentally ill and/or battled addiction.




10.     Marcus had a special place in his heart for his mother and wrote the following poem

for her about a week before he died:

> Mom you are the one who always loved me through good and bad
> No matter if I failed you or made you sad
> I thank you for your undying Love
> that you have given me.
> You may not have thought I noticed but I always
> knew you loved me.
> The Past is the past and I forgive you for everything you
> thought you did wrong.
> I'm just thankful to God that he chose you as my mom.
> You'll never know how much I Love You and what
> You mean to me.
> There are no amount of words to explain this from me.
> Just know that I Love You and I promise I always will Forever. And today,
> I just wanted you to know that I wouldn't want it any other way.
> Love You Marcus DJ.

11.     On March 10, 2016, Marcus was with two friends/acquaintances in a car, in

Burkburnett, and the car was parked near a mobile home.  Apparently, someone in the mobile

home had called police regarding what may have ultimately been a dispute about purchase of baby

clothes and/or some other relatively minor issue.  Police officers requested identification from

Nolan Brown, Myra Brown, and Marcus.  Marcus provided a Texas identification card which the

police officers alleged was fake.  The police officers did their best to attempt to find contraband

for which they could arrest Marcus or one of the two other people – without success.  They found

no guns, and no illegal drugs.  They were unable to determine that any of the three people had

committed a crime at all, much less committed any illegal conduct alleged by the caller in the

mobile home.  Police released Nolan Brown and Myra Brown at the scene but chose to arrest

Marcus and transport him to the City of Burkburnett jail for the allegedly fake identification card

they forced him to produce.  After much confusion between the police officers, extending to a

period of time during which Marcus was ultimately incarcerated, police officers decided that

Marcus had been arrested for allegedly "violating" Texas Penal Code Section 32.21(e)(2).

However, Marcus was not guilty of forgery, and his actions and/or inaction did not meet the elements of the crime.  Nevertheless, City of Burkburnett Police Officer Daniel Elbaum, along with upon information and belief other officers, arrested Marcus.  Officer Elbaum then drove Marcus, under arrest, to the City of Burkburnett jail.



12.     At approximately 6:18 p.m., Officer Elbaum arrived at the City of Burkburnett Police Station with Marcus under arrest and in a police vehicle.  He parked near the back door.  About one minute later, at approximately 6:19 p.m., Officer Matt McDonald and Sergeant Zac Leonard arrived at the Burkburnett Police Department, parking in front of the building.  All police officers (including the police chief) mentioned in this pleading were police officers acting or failing to act in the course and scope of their duties for City of Burkburnett at the referenced times and under color of state law.

13.     At approximately 6:20 p.m. Officer Elbaum took Marcus into the back door of the police department and into the book-in area.  Officer Elbaum removed Marcus' handcuffs, searched him, and began doing book-in paperwork.  Sergeant Leonard and Officer McDonald

entered the police department through the front door at about the same time. Officer McDonald went in to the book-in area.

14.     At approximately 6:21 p.m., Officer McDonald went to the lobby to address any walk-in people. Officer Mullens arrived at the police station at about the same time, and he entered the building through the front door.

15.     At approximately 6:23 p.m., Officer Roy Mullens entered the lobby where Officer McDonald was present. Approximately one minute later, at approximately 6:24 p.m., Officer Mullens left the lobby. Officer McDonald also left the lobby at about the same time and walked back into the police department. At approximately 6:25 p.m., Officer McDonald left the police department.

16.     At approximately 6:27 p.m., Officer Elbaum asked medical questions on the City of Burkburnett Police Department book-in form. That form required Officer Elbaum to ask about issues including prior suicide attempts and mental disorders, and to ask to whether Marcus was or appeared to be suicidal, homicidal, or delusional. At approximately 6:28 p.m., after Officer Elbaum asked Marcus if he ever attempted suicide, Officer Elbaum learned of Marcus' significant, ongoing, and very recent suicidal tendencies and impulses. Marcus was suicidal at the time he was being interviewed by Officer Elbaum. Marcus responded that he had attempted to commit suicide. Officer Elbaum asked how many times Marcus had attempted to commit suicide, and Marcus replied, "Like three." Officer Elbaum asked when was the last time that Marcus attempted to commit suicide. Marcus told Officer Elbaum that he had attempted to commit suicide only three weeks prior to that time. Officer Elbaum asked Marcus whether he went to the hospital. Marcus told him that he went to the state hospital because he tried to cut himself. Officer Elbaum knew that the "state hospital" meant that Marcus was committed due to his attempted suicide. Officer Elbaum knew that Marcus's suicidal tendencies were extreme and serious enough that he had to

be institutionalized at a governmental hospital. Officer Elbaum asked Marcus how he attempted to commit suicide, and Marcus pointed to his inner elbow, said "cut my," and showed a scar to Officer Elbaum. Thus, Officer Elbaum knew that Marcus had used a sharp object and attempted to cut his arm in a manner that would cause him to "bleed out" and die.

17.     At approximately 6:29 p.m., Marcus gave a list of his mental health issues, problems, and/or conditions to Officer Elbaum. Officer Elbaum checked "Suicide Attempts" on the Booking Information form, and wrote next to it "X3 – last 3 wks ago – cut arm." He also checked on the same form the box for "Mental Disorders" and wrote next to it "Depression, Anger Mgmt., Bipolar."



Officer Elbaum indicated at one point during the conversation that he knew that Marcus had mental disorders because he was cutting himself. Officer Elbaum told Marcus in substance that Officer Elbaum had worked in the "medical field of other mental illnesses" [sic] (according to a City of Burkburnett Police Department internal investigation document). Upon information and belief, Officer Elbaum was communicating to Marcus that he fully understood mental health issues which Marcus was experiencing, including his propensity to commit suicide and/or otherwise cause himself serious harm. Officer Elbaum knew, with three prior suicide attempts, the last of which occurring only three weeks prior to Officer Elbaum arresting Marcus, and with visible evidence of a recent cut on Marcus' arm, that Marcus was likely to attempt to kill himself while in custody. Officer Elbaum knew that the likelihood of Marcus attempting to kill himself while in custody was

increased due to mental disorders described as "depression," "anger management," and "bipolar." Officer Elbaum knew that depression combined with prior suicide attempts (one of which being very recent), and anger management issues combined with the effects of bipolar disorder, resulted in an extreme degree of risk that Marcus would serious hurt and/or kill himself while in custody. Further, upon information and belief, Officer Elbaum began working for Grayline Research Center since January 1991, ultimately becoming a certified clinical research coordinator. According to the website for that company, it conducts clinical drug trials including trials related to depression (including Bipolar 1 Depression). Upon information and belief, Officer Elbaum learned significant information while working for Grayline Research Center which further solidified his belief that Marcus was likely to kill and/or seriously harm himself while in custody.

18. Officer Elbaum showed unabashed, conscious disregard for Marcus's reasonable medical needs, and chose to disregard all information obtained during the interview regarding Marcus's suicidal tendencies and impulses and his desire to harm himself. Officer Elbaum chose to disregard his own experience and knowledge regarding the high likelihood that Marcus would kill and/or seriously harm himself. Instead of meeting Marcus's needs, he intentionally placed Marcus into an environment in which Marcus could finally complete what he had attempted before – the taking of his own life. Officer Elbaum chose to put Marcus into a cell, alone and isolated, with clothing that contained a drawstring that would enable Marcus to hang himself. Officer Elbaum knew with virtual certainty that placing Marcus into a cell, with his history of mental disorders and other issues mentioned above, would result in Marcus not leaving the jail alive.

 

19.     At approximately 6:33 p.m., Sergeant Leonard entered the main hallway.   He

opened a door for a male subject and allowed him to enter the main hallway.

20.     At approximately 6:34 p.m., Officer Elbaum escorted Marcus to a cell.   Marcus

asked to make a phone call, and Officer Elbaum brought Marcus back to the book-in area.   Officer

McDonald arrived at the police station and entered the building.

21.     At approximately 6:35 p.m., Officer McDonald walked into the book-in area.   The

male subject to which Sergeant Leonard was speaking left the police department.   Sergeant

Leonard walked back toward dispatch, then back into the hallway, and then into the Sergeant's

office.   Marcus called his mother, Shelly Parham.   Texas Ranger Toby Catlin, who would

ultimately conduct an investigation of Marcus's death, lists this call as being at approximately 6:30

p.m. Ranger Catlin notes that, during that phone call, while Marcus was on the phone with Shelly

Parham, Marcus stated to Officer Elbaum that Marcus did not have his medication.   Officer

Elbaum consciously chose to disregard Marcus' request for medication which would assist him with his severe mental disorders and suicidal tendencies. Officer Elbaum instead chose to let those severe mental issues take their course and result in Marcus' suicide. Officer Mullens arrived at the police department and spoke to people in the lobby.

22.      At approximately 6:36 p.m., Officer McDonald walked into the Sergeant's office. At approximately 6:38 p.m., Officer McDonald exited the Sergeant's office and went back to the book-in area.

23.      At approximately 6:39 p.m., Marcus ended his telephone call with his mother, which was the last time he was ever able to speak to her, and he was escorted to his isolated and unmonitored jail cell by Officer Elbaum. Officer Elbaum chose to ignore Marcus, leaving him alone in his cell for hours, with full knowledge that Marcus would likely attempt to significantly harm and/or kill himself, and with the physical ability to do so through use of a drawstring in his pants. He showed a total and conscious disregard for Marcus's safety and medical needs. He also failed to provide any reasonable accommodation for Marcus's medical needs. In fact, he provided no accommodation whatsoever for Marcus's significant medical needs, his mental health issues, and his suicidal tendencies. Instead, he provided Marcus isolated accommodations in which Marcus would fulfill his unfortunate destiny.

24.      At approximately 6:43 p.m., Officer Elbaum entered the book-in area and sat down at a computer. Upon information and belief, Officer Elbaum was doing nothing important on the computer as compared to Marcus's vital and emergency needs. Officer Elbaum should have been continuously observing Marcus, but instead he sat at a computer. About two minutes later, at approximately 6:45 p.m., Officer Mullens entered through a secure door when walk-in people he had been addressing left the police department.

25.     At approximately 6:46 p.m., Officer Elbaum left the book-in area.  Approximately six minutes later, at approximately 6:52 p.m., Officer Mullens left the police department to respond to a call.

26.     At approximately 6:54 p.m., Officer Elbaum entered the book-in area and sat at a computer.  Once again, while Officer Elbaum sat at a computer doing, upon information and belief, nothing comparatively important, he chose to leave Marcus in his cell, alone, and unmonitored, so that Marcus could fulfill the unfortunate desire which he was led to fulfill as a result of his severe mental illness.  Approximately three minutes later, at approximately 6:57 p.m., Sergeant Leonard told dispatch that he was 10-42 (ending his shift).  He then exited the building.  Officer Leonard would later write, in his statement, that he exited the police department and ended his shift at approximately 6:30 p.m.  Officer Elbaum exited the book-in area and went into the officer's office. At approximately 6:59 p.m., Officer Elbaum once again entered the book-in area and sat at a computer.  Officer Elbaum apparently continued doing nothing comparatively important.  He continued choosing to totally disregard Marcus and his severe and apparent medical needs, such that Marcus would be able to commit suicide.  Marcus remained isolated, alone, and unmonitored.

27.     At approximately 7:00 p.m., Officer Mullens returned to the police station.  Further, at approximately that time, listed as approximately 7:03 by Ranger Catlin, Shelly Parham called the police station and spoke to, upon information and belief, dispatcher Mary Keller.  Marcus had been in his jail cell, unmonitored, at this point for approximately twenty minutes.  Upon information and belief, no one had observed him or checked on him during that period of time. Moreover, in addition to all the information Officer Elbaum had already received about Marcus's suicidal tendencies, and critical need for healthcare, the Department learned again about Marcus' need for his medications.  Shelly Parham asked the dispatcher whether Marcus was going to booked-in, because he needed his medications.  Those medications were necessary for his mental

health.  Shelly Parham left a phone number with the dispatcher for a requested return call.  Ms. Parham's request that Marcus be provided his medication was ignored.  It was consciously disregarded.  Ms. Parham made it clear through her choice of words, and the volume of and inflection in her voice, that it was urgent that Marcus receive his medications to avoid him committing suicide.  Marcus remained isolated, alone, and unmonitored, and Officer Elbaum continued to act in a clearly subjectively and objectively reckless, and far more than unreasonable, manner.

28.    At approximately 7:02 p.m., Officer Elbaum exited the book-in area. Approximately five minutes later, at approximately 7:07 p.m., Officer Elbaum chose to leave the police department to respond to a call.  Officer Elbaum left the police department with knowledge of Marcus' suicidal tendencies, and also left Marcus to fend for himself in dealing with such suicidal tendencies.  Officer Elbaum surely knew that Marcus would ultimately harm and/or kill himself, and Officer Elbaum choosing to leave the police station was a conscious decision to allow that to occur.  Marcus remained isolated, alone, and unmonitored.

29.    Moreover, upon information and belief, during the entire relevant time period described in this pleading, the City of Burkburnett did not have in place any video and/or audio monitoring equipment which captured Marcus' cell in a manner allowing him to be monitored and/or watched by any City of Burkburnett employees and/or police officers.  The City of Burkburnett consciously chose not to provide such monitoring equipment, even though it knew that the failure to observe suicidal and/or significantly mentally ill inmates would be violative of their constitutional rights.  The City of Burkburnett's policy of not securing and/or installing such monitoring equipment resulted in this case in Marcus being able to hang himself.  This is particularly troubling, in light of previous suicide attempts at that facility.  Obviously, the City of Burkburnett simply did not care.  It chose not to purchase equipment which would be relatively

inexpensive as compared to the loss of life. The City of Burkburnett's policy of not having such monitoring equipment shocks the conscience in light of the City of Burkburnett's knowledge of prior inmate attempted suicides and Marcus being kept in a cell, alone, and isolated, with his severe mental health issues. Upon information and belief, the City of Burkburnett made a policy decision not to have audio and video monitoring equipment and chose to expend funds on other matters instead, and such decision was made either by the city council and/or the police chief as policymakers.

30.     At approximately 7:14 p.m., over thirty minutes after Marcus was taken to a jail cell, Officer McDonald walked to the cell to check on Marcus. Officer McDonald did not decide to do so on his own, but he was responding to what appears to be, from an audio recording, Marcus saying, "Help me." Officer McDonald asked Marcus what he needed, and Marcus asked what he was being arrested for. Officer McDonald told Marcus that he had already been told that by the arresting officer. Interestingly, neither Officer McDonald nor any of the other officers could cite an offense for which Marcus's conduct met all of the elements. Marcus was incarcerated for committing a purported offense that he never committed. Instead of explaining to Marcus that neither Officer McDonald nor any of his co-workers could match the offense for which Marcus was purportedly arrested to what actually occurred just before Marcus was arrested, Officer McDonald just refused to answer the question. Officer McDonald then left Marcus to his own devices and walked back to Officer McDonald's office. This was the first time anyone with the City of Burkburnett Police Department checked on and/or observed Marcus while he was in a cell alone, and it would be the last time that Marcus was seen alive. It will take discovery, including interrogatories, requests for admission, requests for production, depositions by written questions, and oral depositions, to determine what Officer McDonald knew at that time as well as policies and procedures of the City of Burkburnett Police Department regarding dissemination to

employees of information known about people incarcerated in the jail.  This would include whether and to whom this information was disseminated, the manner in which it was disseminated, and any written policies regarding such dissemination.   There is clearly a written record of sufficient information to put the City of Burkburnett on notice as to Marcus's ongoing suicidal tendencies and very high risk that he would hurt himself.  Discovery will be necessary to determine the extent to which the City of Burkburnett had a policy whereby such information was not required to be disseminated, which would be unconstitutional, or had a practice in which such information would not be disseminated, which would also be unconstitutional.

31.     About nine minutes later, at approximately 7:23 p.m., Officer McDonald left the police department.  Officer McDonald would later tell Lieutenant Lahoma Vaughn that he had checked on Marcus at approximately 7:30 p.m.  Marcus remained isolated, alone, and unmonitored due to choices made by Officer Elbaum, Officer McDonald, and the City of Burkburnett.

32.     About twenty-five minutes after Officer Elbaum left the police department, he returned to the police department (at approximately 7:32 p.m.).  Officer Elbaum made a conscious choice not to check on and/or monitor Marcus at that time.  Instead, after waiting at least approximately five additional minutes after arriving at the police station (until approximately 7:37 p.m. according to City of Burkburnett records, or at approximately 7:45 p.m. according to Ranger Catlin), he returned Shelly Parham's call received about thirty to forty-five minutes prior.  During that telephone call, though he needed no additional information to continue in his conscious disregard of Marcus's critical medical needs and need for reasonable accommodation, Shelly Parham provided even more information regarding Marcus's suicidal tendencies and the need for him to obtain medication to assist with such tendencies.  Shelly Parham informed Officer Elbaum that Marcus was a suicide risk and needed to take his medication.  Ms. Parham's tone and voice made it evident and clear to Officer Elbaum that he and the City of Burkburnett had a serious

situation on their hands. She made it clear to Officer Elbaum that, unless he immediately took action to care for Marcus' serious medical and emotional needs, Marcus would commit suicide. Officer Elbaum told Shelly Parham that, when Marcus was arrested, he had no medication on him. Shelly Parham explained that Marcus was not capable of keeping up with his medication, and that she administered his medication to him. Shelly Parham also told Officer Elbaum that Marcus had just gotten out of the State hospital, and she asked to bring his medication to him. She also told Officer Elbaum that Marcus could not go without his medication. Officer Elbaum simply did not care and did not allow Shelly Parham to come to the jail and provide and/or administer Marcus's medication to him. Instead, he told Shelly Parham that she could contact the Wichita County jail after Marcus was transferred. Officer Elbaum consciously chose to disregard Marcus' clearly-established constitutional right to reasonable medical care. He chose to shirk, avoid, and disregard his duties as a state actor and as a person who had chosen to arrest and incarcerate Marcus without providing to him any needed medical assistance. Officer Elbaum was unmoved and acted as a proverbial "stone wall" to Shelly Parham's desperate attempts to assist her suicidal son.

33.     It is beyond belief that Officer Elbaum would make such conscious choices and decisions when Marcus's life was hanging in the balance. Unfortunately, due to Officer Elbaum's callous disregard for continued information regarding Marcus' suicidal tendencies, Marcus would never be transferred to the Wichita County jail. Shelly Parham told Officer Elbaum that medication Marcus was taking was prescribed by Helen Farabee. Helen Farabee is a well-known center that specializes in providing community-based treatment and support services for people with severe and persistent forms of mental illness, substance abuse, and intellectual and developmental disabilities. Upon information and belief, Officer Elbaum knew this. "Alarm bells" should have been going off in Officer Elbaum's head, although he needed no additional information to decide to appropriately monitor Marcus. Shelly told Officer Elbaum that Marcus

was prescribed Zyprexa (an antipsychotic medication), Lithium (used to treat manic episodes of bipolar disorder), and Clonidine (used to treat attention deficit hyperactivity disorder). Upon information and belief, Officer Elbaum knew this. Even so, Officer Elbaum flatly notes in his statement, "I advised Parham that I would let the medical staff at the jail know about his current treatments." The thought of Officer Elbaum, being in the best position at that time to do something, simply shrugging off Marcus' medical needs and deferring to others, makes the reader of his statement want to rush into the jail and save Marcus. Officer Elbaum consciously disregarded information received during the call and chose not to check on and/or monitor Marcus. Officer Elbaum's inaction is beyond belief. Unfortunately, it is true. Officer Elbaum chose to allow Marcus to remain isolated, alone, and unmonitored.

34.     Officer Elbaum continued doing nothing comparatively important, continuing to consciously disregard Marcus' significant and life-threatening medical needs.    Eerily, approximately two hours, four minutes after Marcus was put into a jail cell, and approximately one hour, twenty-nine minutes after anyone had checked on Marcus, at approximately 8:43 p.m., sounds can be heard in the audio portion of the audio-video recording (such sounds appearing to come from the jail cells where Marcus was kept). No one responded. No one attempted to help. No one checked on Marcus to see whether he was alright, or whether he was in the process of hanging himself. Upon information and belief, the sounds were those of Marcus attempting to or actually hanging himself, or preparing to do so. Once again, Officer Elbaum did nothing. Officer Elbaum's continued conscious disregard of Marcus' safety, his critical medical needs, and his suicidal tendencies would, and did, ultimately lead to and proximately cause Marcus' death.

35.     At approximately 8:58 p.m., Officer McDonald, Deputy Constable Jared Burchett, and Officer McDonald's ride-along (Ted Kwas) entered the police department. Officer Elbaum continued in his decision to do nothing. No one checked on Marcus even though he may have

been deceased by that point. There was no one for any way to know whether he was deceased, because Officer Elbaum and everyone else at the City of Burkburnett Jail chose not to check on and/or monitor Marcus.

36.     Officer Leonard, in his written statement, wrote that he received a telephone call from Officer Elbaum at approximately 9:19 p.m. Officer Leonard alleges he was not on duty at that time. Officer Leonard wrote that Officer Elbaum told Officer Leonard that he needed assistance at the police station in completing the probable cause affidavit for Marcus's arrest. Officer Elbaum's focus was apparently more on how to keep Marcus incarcerated than on assuring that Marcus did not harm himself. Officer Leonard indicated that he told Officer Elbaum that he would travel to the police station in his personal vehicle to assist.

37.     In their rush to judgment, it appears that City of Burkburnett police officers were not even certain of the alleged crime with which to charge Marcus in response to him being forced to provide an allegedly fake identification card. Officer Elbaum wrote in substance in his statement that, while working on an arrest report and probable cause affidavit for Marcus, he came to the belief that the elements of the alleged offense did not match the charge. Thus, he asked Officer McDonald for help. He also asked Deputy Constable Burchett for help as they looked at the charge. After those three officers were unable to match the elements of an offense with the purported reason that Marcus was arrested, they decided to call Officer Leonard for help. Officer Elbaum decided to call Officer Leonard because they were "struggling with wording the offense." The fact that three officers could not apparently match the elements of an offense with the purported reason that Marcus was arrested demonstrates either a significant level of incompetence, considering the simplicity of the alleged offense, or that Marcus should have never been arrested. The thought of four officers, standing around, looking at such a simple statute, and apparently realizing that Marcus had been arrested for a crime which he did not commit, while at the same

time thinking of Marcus likely already deceased in his cell, is a mental picture that no one wants

to see.  It should have never happened, and it would not have happened if Officer Elbaum had

simply done what he was supposed to have done.  It also would have never happened if the City

of Burkburnett had policies and training in place to continually observe inmates with serious

mental conditions and/or suicidal tendencies.

      38.     Officer Leonard also wrote, that approximately four minutes after receiving the

9:19 p.m. phone call from Officer Elbaum, he received a phone call from Officer McDonald.

Officer McDonald said that he needed immediate assistance at the police station due to Marcus

hanging himself while in custody.

      39.     At approximately 9:21 p.m., which was approximately **two hours after anyone**

**last checked on and/or observed Marcus**, Officer McDonald finally decided to check on Marcus

in his cell.  This was approximately twenty-three minutes after Officer McDonald had returned to

the police station.  Officer McDonald indicated that he intended to go back out on patrol, but he

first asked Officer Elbaum "if he had checked on his prisoner."  Officer McDonald indicated in

his statement that Officer Elbaum flatly stated, "No."  When Officer McDonald went to the cell,

he found what should not have surprised Officer Elbaum – Marcus hanging in his cell (apparently

having committed suicide).  Officer McDonald found Marcus facing away from the door with the

drawstring for Marcus's pants tied around his neck and tied off on the cell bars.  Officer McDonald

yelled for other officers to call for medical assistance.  Burkburnett Police Department Lieutenant

Lahoma Vaughn, after later conducting an internal investigation, would write, "There are no

documented checks of [Marcus] by any officers from 19:14 hours through 21:21 hours, which is a

conflict of department policy #114 (holding facility) and #110 (General Orders)."  It was also a

blatant violation of Marcus's constitutional rights and of federal statutes referenced in this

pleading.

40.     About one minute later, at approximately 9:22 p.m., Officer Elbaum finally chose to enter the jail cell area. It was too late for Marcus. No reasonable officer in the shoes of Officer Elbaum, knowing all that he knew, would have expected anything other than what police officers found when they entered the jail cell area. In fact, all reasonable police officers in the shoes of Officer Elbaum would have expected to find exactly what they found. Deputy Constable Burchett also entered the jail cells area, and paramedics were notified. Deputy Constable Burchett pulled out his knife and cut the string with which Marcus had hung himself. Lieutenant Vaughn positioned Marcus on his back and felt for a pulse. He felt no pulse. Upon information and belief, Marcus was already deceased, and he had been for quite some time.






41.     At approximately 9:23 p.m., police dispatch contacted Police Chief Ed Stahr. About two minutes later, at approximately 9:25 p.m., police dispatch contacted Lieutenant Vaughn. Also, at about that same time, Officer McDonald contacted Detective Zellner.

42.     At approximately 9:26 p.m., paramedic Dan King and firefighter Chase Carter arrived at the police department. About two minutes later, at approximately 9:28 p.m., paramedic Pat Hanlon arrived at the police department. Sergeant Leonard arrived at the police department at about the same time.

43.     At approximately 9:35 p.m., Lieutenant Vaughn arrived at the police department. Approximately four minutes later, Chief Stahr arrived at the police department. Chief Stahr at some point contacted City Manager Mike Whaley to inform him as to what had occurred.

44.     At approximately 9:40 p.m., Detective Johnny Zellner arrived at the police department. About nine minutes later, at approximately 9:49 p.m. American Medical Response

("AMR") arrived at the police department. Upon information and belief, paramedics who arrived were Curtis Martin, Kayla Sosa, and Becky Stouffer. About two minutes later, at 9:51 p.m., Judge Viavattene pronounced Marcus as being deceased.

45.     About thirty minutes later, at approximately 10:21 p.m., Texas Ranger Catlin was notified for the first time. Ranger Catlin ultimately conducted an investigation of what he termed a questionable custodial death. Chief Stahr told Ranger Catlin that he was "going to find out anyway" – Marcus had stated during the book-in process that he was suicidal. Upon information and belief, in addition to other information referenced above which Marcus provided during the book-in process with Officer Elbaum, he flatly stated that he was suicidal. Chief Stahr also told Ranger Catlin that Marcus's mother had called dispatch several times, asking to bring Marcus's medications to Marcus, because Marcus had been off of his medications for a couple days. Upon information and belief, Chief Stahr offered no excuses for Officer Elbaum and the City because he knew that no excuses were appropriate. Chief Stahr knew that Officer Elbaum and the City of Burkburnett Police Department had failed in providing medical care to, protecting, and avoiding unconstitutional punishment of Marcus as a pretrial detainee.

46.     On the same date, Texas Municipal Police Association attorney Lance Wyatt called Ranger Catlin and told Ranger Catlin that Mr. Wyatt would be representing the police officers in the investigation. Attorney Wyatt told Ranger Catlin that he could obtain a brief synopsis from the officers, but that attorney Wyatt wanted to be present when Ranger Catlin obtained statements.

47.     At approximately 10:42 p.m. (10:52 p.m. according to Ranger Catlin), Shelly Parham called the City of Burkburnett Police Department once again and wanted to know when Marcus would be transferred to Wichita County so that she could take to him his required medication. She offered to drive to the Burkburnett jail to bring Marcus' medication to him. She spoke with dispatcher Liberty Billingsley during that call. Ms. Billingsley informed Lieutenant

Vaughn that Shelly Parham was on the phone. Shelly Parham had no clue what had occurred, although everyone at the police department knew. Medical personnel had already determined that Marcus could not be revived, and AMR had been cleared to leave the scene by a hospital emergency department physician. Lieutenant Vaughn wrote in a report supplement that Judge Nancy Viavattene had been notified and officers were awaiting her arrival (even though other records indicate that Judge Viavattene had pronounced Marcus as being deceased at approximately 9:51 p.m.).

48.     Lieutenant Vaughn then spoke with Shelly Parham. Lieutenant Vaughn told Shelly that she needed to speak with Shelly in person. Shelly, suspecting that something was wrong with Marcus, began to ask if he was okay and was alive. Shelly began to scream into the phone. Lieutenant Vaughn told Victor, Shelly's fiancé, during that call, that Marcus was no longer alive. Lieutenant Vaughn then told Victor that she was leaving the police station and driving to Shelly Parham's home to explain the situation and answer their questions.

49.     Information regarding the 10:42/10:52 p.m. call above was obtained substantially from the City of Burkburnett Police Department records. Such records do not, upon information and belief, include an 11:01 p.m. call from Shelly Parham to the Burkburnett Police Department. Shelly Parham asked what was going on. The City of Burkburnett Police Department put her on hold for several minutes, and then the call terminated. Moreover, according to Ranger Catlin, during the 10:42/10:52 p.m. call referenced above, Shelly Parham stated once again that she would bring Marcus' medications to Burkburnett. She stated that Marcus needed his medication, and once again asked if he was okay.

50.     Chief Stahr and Lieutenant Vaughn went to Shelly Parham's home in Wichita Falls. Lieutenant Vaughn asked Wichita Falls Police Department Lieutenant Kevin Folmar for uniformed officers to respond to Ms. Parham's home. When Lieutenant Vaughn arrived, she met

with Wichita Falls Police Department officers and walked to Shelly Parham's residence. Lieutenant Vaughn informed Shelly and others that Marcus committed suicide using a drawstring from his pants to hang himself in his cell. Shelly fell to the ground and said that she could not breathe. Wichita Falls Police Department officers requested an ambulance. Family members all began to ask questions at the same time, mostly, "Why weren't you watching him?" They were expressing what lay people knew, and what Officer Elbaum and the City of Burkburnett as professionals knew – Marcus should have been watched. Anyone choosing not to watch Marcus, with information possessed by Officer Elbum and the City of Burkburnett Police Department, would show a complete and total conscious disregard for Marcus' health and safety, and ultimately his life. Victor ultimately asked the police officers to leave, and Shelly asked that an ambulance not come to her home.

51.     Dallas County, through the Southwestern Institute of Forensic Sciences at Dallas (Office of the Medical Examiner) conducted an autopsy. The Wichita Falls Embalming and Mortuary Service had responded to the scene and ultimately transported Marcus's body to Dallas. Janis K. Townsend-Parchman, M.D., medical examiner, wrote in her report, "It is my opinion that Marcus Johnson, a 22-year-old Latin male, died as the result of hanging, which was self-inflicted." The manner of death was listed as "suicide." The related Cause of Death Report, also signed by Dr. Townsend-Parchman, listed the cause of death as hanging, and the manner of death as suicide. The Defendants' actions and/or inaction caused and proximately caused Marcus' death.

52.     On or about March 11, 2016, Police Chief Stahr ordered an internal affairs investigation. He asked Lieutenant Vaughn to head that investigation, writing in a letter to her:

> On 03-10-2016 [ ] there was an inmate death in our holding facility. Please review all information in regards to this incident up to and including adherence to department policy and procedures. Please provide a report with the results of your investigation and any recommendations you may have.

Lieutenant Vaughn wrote a note to Chief Stahr, on March 21, 2016, writing in part that she had drafted letters to each officer on duty when Marcus was taken into custody to notify them of the internal investigation. She also wrote that she intended to "determine if department policy and procedures were followed" and report to Chief Stahr within fourteen days. She wrote letters to Sergeant Leonard, Officer McDonald, Officer Elbaum, and Officer Mullens.

53.     The City of Burkburnet Police Department, through Chief of Police Stahr and Lieutenant Vaughn, notified those four police officers of their rights related to the internal investigation. Chief of Police Stahr and Lieutenant Vaughn wanted to be sure that City of Burkburnett police officers were provided with required constitutional protection (unlike what was provided to Marcus). The City of Burkburnett Police Department had a preprinted form which it used to notify those officers of their constitutional rights related to internal investigation communications, and it included a City of Burkburnett mandate that the police officers not discuss any of the details of the investigation with anyone except a lawyer (who could further advise them of their constitutional rights). The title of the City of Burkburnett Police Department form included the phrase "Garrity Warning." A "*Garrity* warning" arises from the United States Supreme Court case styled *Garrity vs. New Jersey* (1967). In *Garrity*, a police officer was required to make a statement or else be fired. The police officer was then prosecuted for the statement. The United States Supreme Court found that the police officer had been deprived of his Fifth Amendment right to silence. The City of Burkburnett police department gave the following *Garrity* warning to its four officers:

**CITY OF BURKBURNETT**
**POLICE DEPARTMENT**

**Internal Investigation**
**Garrity Warning And Confidentiality Order**

You are advised that you are being questioned as part of an internal investigation by the City of Burkburnett.  You will be asked to answer questions directed and related to the performance of your official duties and/or fitness for office.  You are entitled to all rights and privileges guaranteed by the laws and Constitution of this State and the United States Constitution, including the right not to be compelled to incriminate yourself.

If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to disciplinary action up to and including the termination of your employment.  If you do answer, neither your statement nor any information or evidence that is gained by reason of such statements can be used against you in any subsequent criminal proceedings, except as allowed by law.  However, these statements may be used against you in relation to subsequent disciplinary charges.  Your statements can also be used against you in a perjury prosecution arising out of the giving of a false statement.

The confidentiality and integrity of this investigation must be maintained. You are hereby ordered not to discuss any of the details of this investigation with anyone including but not limited to witnesses, prospective witnesses, or any member or non-member of this Department. The only exception to this order is that if you wish, you may consult a lawyer to advise you of your constitutional rights and/or any other legal concerns that you may have regarding this proceeding.

The City of Burkburnett Police Department was well aware of the United States Constitution, providing to its own officers with a warning regarding their constitutional right to silence.  Thus, upon information and belief, it and its officers were aware of due process rights afforded to Marcus under the Fourteenth Amendment to the United States Constitution, which included the right to receive reasonable medical care, the right to be protected, and the right not to be punished as a pretrial detainee.  Chief Stahr and the City of Burkburnett chose to have a policy or practice whereby inmates with suicidal tendencies and severe medical needs would not be continuously monitored, and they chose to implement that policy and/or practice by failing to buy what would have been relatively inexpensive audio and video monitoring equipment.  This policy or practice led to and proximately caused Marcus's death.   The City of Burkburnett Police Department protected its officers' right to remain silent but failed to protect what was to Marcus a far greater right – his right to live.

54.     After the City of Burkburnett internal investigation concluded, Chief Stahr wrote a letter of suspension to Officer Elbaum.  Amazingly, Officer Elbaum was suspended for only one

day without pay for knowing, egregious, and unacceptable violation of Marcus's constitutional

and statutory rights (resulting in Marcus's death).



## POLICE DEPARTMENT
### CITY OF BURKBURNETT
208 East Fourth Street
Burkburnett Texas 76354
Phone:(940)569-2231   Fax: (940) 569-1102

CHIEF OF POLICE
ED STAHR

**To:** Officer Daniel Elbaum

April 14, 2016

**Subject:** Letter of Suspension

On 03-10-2016, an incident occurred in our holding facility that resulted in the death of Marcus Johnson. I instructed Lt. Vaughn to open an internal investigation into this incident and all materials relevant to this matter.

Lt. Vaughn interviewed all officers present on second shift patrol on 03-10-2016. Lt. Vaughn also reviewed all reports, vehicle and building videos available in regards to this incident. After reviewing LT. Vaughn's report, I have noted the following.

You were the transporting officer and booking officer for Mr. Johnson. In reviewing the details of the incident, it appears you were given information by the victim that he had attempted suicide in the recent past. You were also given information by his mother of potential mental issues by public service call to the department. I believe the proper course of action on your part would have been to share this information with the other officers of your shift, along with following the established Burkburnett Police Department Operating Guideline as it relates to the holding facility. I also feel there were no extenuating circumstances that prevented you from following the written departmental policy in regards to you checking the prisoner at least every 30 minutes.

You violated BPOG to wit: #114 Section <u>Supervision of Detainees</u> Item #1 Detainees will be observed every 30 minutes. Detainees who are security risks should be under closer observation and may require more frequent observation. This classification includes not only detainees who are violent but also those who are suicidal or mentally ill or demonstrate unusual or bizarre behavior.

For that reason I am placing you on One (1) day suspension without pay.

Chief Ed Stahr
Burkburnett Police Department

I acknowledge I have received a copy of this letter.

Officer Daniel Elbaum

55.     Chief Stahr also reprimanded Officer McDonald in writing. Chief Stahr noted in

part that Officer McDonald was in charge of the shift after Sergeant Leonard ended his shift. Chief

Stahr also noted that Officer McDonald was responsible to ensure that appropriate observations of

Marcus were made.



**POLICE DEPARTMENT**
CITY OF BURKBURNETT
208 East Fourth Street
Burkburnett Texas 76354
Phone:(940)569-2231   Fax: (940) 569-1102



CHIEF OF POLICE
ED STAHR

To:  Officer Matt McDonald                                    April 14, 2016

Subject:  Letter of Reprimand

On 03-10-2016, an incident occurred in our holding facility that resulted in the death of Marcus Johnson.  I instructed Lt. Vaughn to open an internal investigation into this incident and all materials relevant to this matter.

Lt. Vaughn interviewed all officers present on second shift patrol on 03-10-2016. Lt. Vaughn also reviewed all reports, vehicle and building videos available in regards to this incident.  After reviewing LT. Vaughn's report, I have noted the following.

You were the ranking officer in charge of the shift once Sgt. Leonard left for the rest of the shift.  Under the established Burkburnett Police Department Guidelines, the ranking officer is also responsible to ensure that observations are made of any/all prisoners in the holding facility.  I have taken into account you did check the prisoner yourself during the shift, however you did not make sure this was continued throughout the shift according to the Departmental Policy.

You violated BPOG to wit:  #114 Section <u>Supervision of Detainees</u> Item #1&3 #1- Detainees will be observed every 30 minutes.  Detainees who are security risks should be under closer observation and may require more frequent observation. This classification includes not only detainees who are violent but also those who are suicidal or mentally ill or demonstrate unusual or bizarre behavior. #3- It is the responsibility of the ranking officer on shift to ensure that observations are made.  An officer will make the observations.

For that reason, I am placing this letter of reprimand in your personnel file.

Chief Ed Stahr
Burkburnett Police Department

I acknowledge I have received a copy of this letter.

Officer Matt Mcdonald

56.     Finally, Chief Stahr wrote what he termed a "Letter of Council" [sic] to Sergeant

Leonard.  Interestingly, Chief Stahr noted the difficulty police officers had determining the alleged

crime with which they would attempt to have Marcus charged for the alleged fake identification

card.  Chief Stahr also noted that such confusion caused Marcus to be in custody of the City of

Burkburnett longer than he should have been. The letter seems to cap a description of a series of

events showing a police department acting ineptly with conscious disregard for Marcus's welfare.

On 03-10-2016, an incident occurred in our holding facility that resulted in the death of Marcus Johnson. I instructed Lt. Vaughn to open an internal investigation into this incident and all materials relevant to this matter.

Lt. Vaughn interviewed all officers present on second shift patrol on 03-10-2016. Lt. Vaughn also reviewed all reports, vehicle and building videos available in regards to this incident. After reviewing LT. Vaughn's report, I have noted the following.

You were the Sergeant over second shift for the beginning of this incident, I have taken into account your scheduled time off beginning at approximately 1910. I have reviewed Lt. Vaughn's report along with your responses to the events and have noted several areas of concern. The following are the items of concern.

1. The female subject was allowed to stay on her cell phone. This is also not good officer safety tactics for a variety of reasons jeopardizing all officers' safety along with the other subjects at the scene.

2. As the supervisor of the shift it is your responsibility to make sure your officers are aware of any action that needs to be taken. There seemed to be a large amount of debate/confusion on what to charge the subject with. This caused the subject to be in our custody a longer amount of time. You seemed to try by public service several times to clarify this, without success. As a supervisor you are responsible for your shift and are held to a higher standard is this regard, to insure the officers of your shift receive clarification when needed, and the detainees are transported in a timely manner.

For that reason, I am placing this letter of counciling in your personnel file. I am also requiring you to take the following actions.

1. At the earliest date possible enroll in additional supervisor training with prior approval by the Chief of Police or his designee.

2. Hold mandatory meetings with all members of second shift in regards to BPOG #114 Holding Facilities. Also hold mandatory meetings with all members of second shift on proper officer safety tactics as it relates to pat downs for weapons. These meetings will be coordinated and approved by the Chief of Police or his designee.

Chief Ed Stahr
Burkburnett Police Department


I acknowledge I have received a copy of this letter.

Sergeant Zac Leonard

57.    The City of Burkburnett position description for a police officer requires the officer

to be familiar with current state law and city ordinances, along with Department and city employee

policies. A police officer must be state-certified, with a Basic Certificate, and have the ability to

work with others and understand citizens and culture that affect the Burkburnett area. An officer

must have one year of prior experience. The City of Burkburnett also requires a police officer to have the ability to work under pressure and "high stressful situations."

58. The City of Burkburnett position description for a police sergeant requires the sergeant to "[o]versee general operations of patrol officers." A police sergeant also must have "[c]onsiderable knowledge of [D]epartmental procedures, rules and regulations," and also "[c]onsiderable knowledge of applicable federal, state and local laws and ordinances, including laws of arrest." The position description also requires a sergeant to have "[c]onsiderable knowledge of the principles, practices and procedures" of his or her "area of assignment." A police sergeant must also have the ability to quickly analyze situations and determine a proper course of action. The City of Burkburnett moreover requires a police sergeant to have an Intermediate Peace Officer License and at least four prior years of continuous service as a police officer with the City of Burkburnett Police Department. A police sergeant's duties include "responsibility for the supervision of and coordination of sworn and civilian personnel." A sergeant must also have "advanced knowledge of the procedures and practices of the shift to which assigned and the ability to direct and supervise subordinates under normal and emergency circumstances." A police sergeant will perform his or her work with "considerable independence and in accordance with applicable laws, ordinances and regulations under the general supervision of a superior officer."

59. On March 16, 2016, Chief Stahr asked Detective Zellner to attempt to make contact with the person who contacted the police department and which had led to Marcus's arrest. Detective Zellner listened to the recording of the telephone conversation in which the person reported the incident, and it was apparent to Detective Zellner that the reporting party (Stephanie) was being deceptive. Detective Zellner noted that she first said "my house" and then quickly said "I mean my neighbor's house." The dispatcher during that call had asked for "Stephanie's" name several times, but she avoided providing it.

60.     On Thursday, March 17, 2016, at approximately noon, City of Burkburnett

Detective Donald Osborn arrived at the law firm of Taylor-Olson-Adkins-Sralla-Elam, LLP at

6000 Western Place, Suite 200, Fort Worth, Texas to deliver evidence regarding Marcus's death.

Detective Osborn alleged in his statement that he handed a thumb drive containing photographs,

video evidence, and call logs of the incident to attorney Wayne Olson. Attorney Olson signed a

Chain of Custody form, and Detective Osborn indicated that he left all of the evidence and the

Chain of Custody form with Attorney Olson. Detective Osborn also indicated that he retained a

copy of the Chain of Custody form to be kept with the case file at the City of Burkburnett Police

Department.

61.     This is not the first time the City of Burkburnett Police Department had an issue

with a suicidal prisoner, and it has disclosed other incidents. On October 21, 2011, the City of

Burkburnett Police Department arrested a Frank Snyder. Mr. Snyder had allegedly been exposing

himself in public. Mr. Snyder had also allegedly been walking on East 3rd Street, heading toward

I-44, jumping of vehicles. He was then observed walking on an old abandoned section of roadway

heading toward the Red River. These were clear signs of erratic behavior, mental illness, and/or

an intent to commit suicide.

62.     The City of Burkburnett, when providing copies in response to an open records

request, apparently redacted what Mr. Snyder answered when being asked, during book-in at the

police station, whether he was suicidal, homicidal, or delusional. Interestingly, it makes little sense

to ask someone who is delusional whether they are delusional. A police officer should be trained

to recognize a potentially delusional person and not simply ask a question to which an accurate

response may likely be impossible. Regardless of the answer, which was removed from the

document produced to the Plaintiffs' lawyer in this case, the City of Burkburnett Police

Department placed Mr. Snyder in cell M1, removed blankets from the cell, and placed them on the

floor outside the cell on the opposite wall.  Upon information and belief, Mr. Snyder had indicated that he was suicidal, and the City of Burkburnett was attempting to remove items from his cell with which he could commit suicide.

63.     On the same date, police officers responded to the police department regarding Mr. Snyder making what they believed to be "lots of strange noises from the cell."  When they arrived, they determined that Mr. Snyder was able to obtain one of the blankets and was laying on the bed covered up with it.  Officer Hamlin observed a piece of the blanket hanging from the top bar of the cell.  Once again, in documents received by the Plaintiffs' attorney, the City of Burkburnett apparently redacted certain information.  The document reads, "Snyder stated he had [information redacted] and then called out for officers to help.  Snyder stated he was barely able to get himself down from his makeshift [information redacted]."  Upon information and belief, Mr. Snyder had indicated that he had attempted to hang himself and was barely able to get himself down from his makeshift noose.  The City of Burkburnett's law firm apparently redacted additional information related to that incident.  However, upon information and belief, the City of Burkburnett Police Department then removed Mr. Snyder from his cell for the purpose of protecting him and keeping · him from committing suicide.  Officers asked that medics be dispatched to the jail to assist Mr. Snyder, so that he could ultimately be medically screened for, upon information and belief, suicidal tendencies.

64.     Thus, the City of Burkburnett had been aware for years of the risk of jail pre-trial detainees committing suicide.  The City of Burkburnett was aware that, if screening and/or pre-arrest actions of a detainee indicated the detainee might harm himself or herself, the City of Burkburnett should take action to avoid such an occurrence.  The City of Burkburnett knew that it must provide reasonable medical care to such persons, which would include appropriate observation, and reasonable accommodations.

65.     On January 16, 2014, the City of Burkburnett Police Department had another, upon information and belief, apparent attempted suicide in one of its jail cells. Officer Barnes was doing a cell check on what were at the time four male prisoners. He looked through a window and observed a male prisoner, Earl Ray-Shane Bolf, doing something which was, once again, redacted from documents provided to the Plaintiffs' attorney in response to an open records request. Upon information and belief, Mr. Bolf had hung himself or was attempting to hang himself with a shirt. Officer Barnes then yelled for Officer McDonald (upon information and belief, the same Officer McDonald involved in Marcus' death) and Sergeant Hogue and ran to get keys to the hallway and cell. Officers Barnes and McDonald entered the cell, and Officer McDonald lifted Mr. Bolf higher into the air so that Officer Barnes could grab his shirt. The shirt allegedly then came loose. Mr. Bolf was then lowered and ordered to strip his remaining clothes. When the police department called paramedics to evaluate Bolf due to the pressure and compression of something which was, once again, redacted by the City of Burkburnett attorneys, paramedic Skinner indicated that Mr. Bolf should be transported to an emergency hospital room for further evaluation.

66.     The City of Burkburnett Police Department Chief of Police, in this case Chief Stahr, is according to the City of Burkburnett's Holding Facility policy "solely responsible for the management of the holding facility." That policy also indicates that day-to-day operation of that facility is the responsibility of the ranking police officer on duty. When the City of Burkburnett refers to its Holding Facility, it is referring to the jail in which Marcus was incarcerated as a prisoner. The Holding Facility policy which was, upon information and belief, effective at the time Marcus was incarcerated, had an original effective date of December 1, 2013 and was signed by Ed Stahr as Chief of Police. The document also indicates that it is Guideline #114. The document charges all supervisors and officers with responsibility for enforcement of the Holding

Facility procedures.  That document includes several policies, some relevant portions of which are listed below.

67.      Security and Control Policy 1 reads, "Officers will not enter the holding facility alone unless they are monitored by either audio or visual means or have at least one other officer present.  The dispatcher will monitor the audio until the officers reappear after putting the detainee in a cell.  This policy demonstrates the physical isolation of the prisoner cells, including the cell in which Marcus was incarcerated.

Supervision of Detainees Policy 1 reads:

Detainees will be observed every 30 minutes. Detainees who are security risks should be under closer observation and may require more frequent observation. This classification includes not only detainees who are violent but also those who are suicidal or mentally ill or demonstrate unusual or bizarre behavior. All observations will be logged with the dispatcher.

Supervision of Detainee Policy 3 reads, "It is the responsibility of the ranking officer on shift to ensure that these observations are made. An Officer will make the observations." Supervision of Detainee policy 1, instituted by Chief Stahr, is insufficient and does not meet medical or constitutional muster regarding pre-trial suicidal detainees such as Marcus.

68.      Over twenty-five years ago, in November 1991, the Texas Commission on Jail Standards published the Guide for Development of Suicide Prevention Plans.  Even that long ago, when society and medical professionals as a whole knew much less than they have learned over the last few years, the Commission recommended continuous observation for high risk, acutely suicidal inmates who had attempted suicide.  Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 25 years ago (in 1992, unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Although the mother did not prevail,

Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit, regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**
>
> **What we learn from the experiences of Henderson County is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation.
>
> So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

69.    The blatant constitutional violations described by this pleading were so clear that they gained media attention and the attention of at least one disability rights organization.

# Why weren't you watching him?'

### onitoring urkburnett e at issue

**stopher Collins**
annett.com
533

_is part two of rt article detail-takes made by the_

_Burkburnett Police Department in the suicide of an inmate at the city's jail._

At 9:21 p.m. on March 10, it had been two hours since any officer had seen Marcus Johnson alive. The 22-year-old man had been booked that evening into Burkburnett's city's jail, which serves as a temporary holding center for prisoners awaiting transfer to the larger Wichita County Jail.

Documents obtained by the Times Record News through a state open records request show that Burkburnett police officer Matthew McDonald went to check on Johnson, finding that Johnson had hanged himself from the bars of his jail cell using the drawstring of his pants.

McDonald called for help. Officer Daniel Elbaum and a constable who happened to be at the jail performed CPR on Johnson while waiting for an ambulance to arrive.

It was too late. Johnson was dead.

Both Elbaum and

**See POLICE, 6A**

# Burkburnett police actions studied

### ▪ Inmate's suicide prompts look at mistakes

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

_This is part one of a two-part article detailing mistakes made by the Burkburnett Police Department in_ the suicide of an inmate at the city's jail.

Burkburnett police officers committed a series of errors on March 10, from the time they responded to a disturbance call that evening to the time they found 22-year-old Marcus Johnson dead, hanging in a jail cell.

The mistakes were revealed in an internal investigation report obtained by the Times Record News through an open records request. Documents show a police department in a "state of confusion," compounded by a lack of leadership and non-adherence to rules regarding the treatment of prisoners.

The investigation found that a Burkburnett police sergeant "left the officers on duty in a state of confusion," which "probably extended Johnson's stay in the holding facility." Another officer was found to have denied Johnson the opportunity to take his antipsychotic medication, despite being told by Johnson that he suffered from several mental disorders and had tried to commit suicide just three weeks earlier.

After being left alone and unmonitored in a jail cell for two hours, an officer found Johnson had hanged himself to death using the drawstring of his pants.

One officer, Daniel Elbaum, was suspended for one day in connection with the incident. Another officer, Matt McDonald, was reprimanded, and a supervisor, Sgt. Zac Leonard,

**See POLICE, 6A**

# Burkburnett officer suspended

### ▪ Punishment comes after inmate's death

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

A Burkburnett police officer was suspended for one day after an inmate at the city's jail hanged himself earlier this year, documents indicate.

Another officer received a letter of reprimand in connection with the March 10 death of 22-year-old Marcus Johnson, according to internal documents obtained Wednesday by the Times Record News through a state open records request.

Johnson was arrested by Burkburnett police that evening after authorities were called to the scene of a disturbance on South Avenue B. It was determined that Johnson was carrying a fake ID. He was handcuffed and booked into the city jail on a forgery charge.

Despite being told that Johnson had attempted suicide in the past and that he had "mental issues," police jailed Johnson and did not adequately monitor him while he was being held in a cell.

The probe showed that Officer Daniel Elbaum violated a city statute by not checking on the prisoner at least every 30 minutes.

**See JAIL, 6A**



Times Record News | Thursday, October 13, 2016

Section B

# Local

# Group investigating Burk jail suicide

■ **Disability Rights Texas gathers info on death**

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

A quasi-governmental organization that has been designated the state's mental health advocate has opened an investigation into the death of a mentally ill man in Burkburnett police custody.

An open records request submitted by Disability Rights Texas to the city of Burkburnett this year shows the group is gathering documents in connection to the suicide of prisoner Marcus Johnson, who hanged himself in a jail cell after police refused to allow him to take his antipsychotic medication in March.

Johnson reportedly suffered from a number of mental illnesses, among them bipolar disorder. He was jailed on a felony forgery charge after being in possession of a fake ID.

One Burkburnett police officer was suspended for a day because of the death. Another officer received a letter of reprimand and a third was sent a letter of counseling. The Texas Rangers opened an investigation, but documents do not show that an investigator recommended criminal charges for any of the officers involved.

The Times Record News previously reported Johnson's death was preceded by several police errors, including a violation of jail procedures and an unwarranted refusal to let Johnson take his medication.

Disability Rights Texas is part of a "national network of protection and advocacy organizations" that aims to secure the rights of people with disabilities,

according to its website. The nonprofit agency was created by Congress and is federally designated.

Federal law gives the organization authority to investigate "incidents of abuse and neglect of individuals with mental illness," the Texas Attorney General's Office wrote this month in a letter to the city of Burkburnett. The city had requested an opinion from the AG's office when Disability Rights Texas requested information about Johnson's death — the city

argued it should be allowed to withhold a portion of those documents.

The office ruled that Disability Rights Texas must be provided with some of the requested information because it had "probable cause to believe" that Johnson had been neglected or abused while in police custody.

Disability Rights Texas did not return a Times Record News call Wednesday to discuss the status of its investigation.

# Burk jail death with DA's office

■ **DPS sends suicide case for review**

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

The Texas Department of Public Safety has forwarded the results of

its investigation into the death of a man inside the Burkburnett jail this year to the Wichita County District Attorney's Office for its consideration.

DPS Sgt. John Gonzalez told the Times Record News the agency completed its investigation into the suicide of Marcus Johnson late last week, sending the case to prosecutors, who

may decide to convene a grand jury.

After being left alone and unmonitored in a jail cell for two hours on March 10, Johnson was found by police hanged to death from the drawstring of his pants.

An internal investigation — conducted separately from the DPS probe — found that three officers

acted inappropriately in the incident. One Burkburnett police officer, Daniel Elbaum, was found to have denied Johnson the opportunity to take his antipsychotic medication, despite being told by Johnson and his mother that he suffered from several mental disorders and had tried to

**See DEATH, 6A**

---

<u>Cause of Action Against Daniel C. Elbaum Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right to Reasonable Medical Care as a Pretrial Detainee (Episodic Act or Omission)</u>

70.     In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, Defendant Daniel C. Elbaum

is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to reasonable

medical care guaranteed by the 14th Amendment to the United States Constitution. Pre-trial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. Officer Elbaum acted and failed to act under color of state law at all times referenced in this pleading. Officer Elbaum wholly or substantially ignored Marcus's suicidal tendencies and his obvious serious medical needs, and he was deliberately indifferent to those medical needs. Officer Elbaum was not just aware, but well-schooled and thoroughly knowledgeable of Marcus's suicidal impulses due to multiple communications regarding those impulses, as well as the need for Marcus to take medication related to those impulses and his serious mental health issues. He gained this knowledge through several direct communications with Marcus and Marcus's mother – Shelly Parham. Marcus had a troubled and distraught demeanor while at the jail, although his demeanor as compared to all other information regarding prior suicides and his need for medication was a minor factor in knowledge gained by Officer Elbaum and the City regarding Marcus's suicidal tendencies. Thus, he had subjective knowledge of the substantial risk of suicide and responded with deliberant indifference to that risk. He was aware of the excessive risk to Marcus' health or safety and was aware of facts from which an inference could be drawn of serious harm (and he in fact drew that inference). In fact, based on what occurred, it was more than an inference to Officer Elbaum. It was blatantly apparent. Officer Elbaum violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Marcus, as a pretrial detainee, had a clearly established right to receive reasonable medical care. This right included the right to be continuously and appropriately monitored. This right also included the right to have removed from his cell known items which are commonly used by suicidal inmates to kill themselves, such as the drawstring in Marcus's pants.

71.     In the alternative, Officer Elbaum's conscious disregard, state of mind, subjective

belief, subjective awareness, or mental culpability is irrelevant to the determination of the constitutional violation set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause. *Id*. Since such constitutional protections flow from the same clause, the analysis of what it takes to prove such constitutional violations should be identical.

72.     In *Kingsley*, a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court was determining the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id* (emphasis in original). The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in such excessive force cases, and that the officer's subjective awareness was irrelevant. *Id*. The Court did so, acknowledging and resolving disagreement among the Circuits. *Id*. at 2471-72.

73.     The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id*. at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id*. at 2473. Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding of the offending police officers for an episodic claim but instead instructed all federal courts to analyze officers' conduct on an

objectively reasonable basis. There is no reason to treat pretrial detainees' rights to reasonable medical care differently.

74.     It appears that this standard is now the law of the land. Earlier this year, in *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.

75.     The majority opinion gave only three reasons for its determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Thus, the trail leads to only one place – an objectively unreasonableness standard, with no regard for Officer Elbaum's subjective belief or understanding, should apply in

this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and simply apply an objective unreasonableness standard to claims in this case. There should be no subjective state of mind and/or conscious indifference standard necessary to be applied to Mr. Elbaum. The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

76.     Officer Elbaum is not entitled to qualified immunity. Officer Elbaum's denial of reasonable medical care, total disregard for Marcus's health and safety, and total disregard for Marcus's suicidal tendencies and propensity to hurt himself caused, proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).

77.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas constitution, common law, and all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seek recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses;

- funeral expenses;  and

- exemplary/punitive damages.

78.    Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson. The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum. If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, Officer Elbaum's actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- loss of companionship and society that she would have received from her son, Marcus; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Marcus's constitutional rights. Officer Elbaum's actions and inaction showed a reckless or callous disregard of, or indifference to, Marcus's rights and safety. Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

Cause of Action Against Daniel C. Elbaum Under 42 U.S.C. § 1983 for Violation of
Marcus Johnson's 14th Amendment Due Process Right to be Protected from Harm as a Pretrial
Detainee (Failure-to-Protect Claim) (Episodic Act or Omission)

79.    In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, Defendant Daniel C. Elbaum

is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to be protected

from harm guaranteed by the 14th Amendment to the United States Constitution.  Officer Elbaum

acted and failed to act under color of state law at all times referenced in this pleading.  Officer

Elbaum wholly or substantially ignored Marcus's suicidal tendencies and his obvious serious

medical needs, and he was deliberately indifferent to those medical needs.  Officer Elbaum was

not just aware, but well-schooled and thoroughly knowledgeable of Marcus's suicidal impulses

due to multiple communications regarding those impulses, as well as the need for Marcus to take

medication related to those impulses and his serious mental health issues.  He gained this

knowledge through several direct communications with Marcus and Marcus's mother – Shelly

Parham.  Marcus had a troubled and distraught demeanor while at the jail, although his demeanor

as compared to all other information regarding prior suicides and his need for medication was a

minor factor in knowledge gained by Officer Elbaum and the City regarding Marcus's suicidal

tendencies.  Thus, he had subjective knowledge of the substantial risk of suicide and responded

with deliberant indifference to that risk.  He was aware of the excessive risk to Marcus' health or

safety and was aware of facts from which an inference could be drawn of serious harm (and he in

fact drew that inference).  In fact, based on what occurred, it was more than an inference to Officer

Elbaum.  It was blatantly apparent.  Officer Elbaum violated clearly established constitutional

rights, and his conduct was objectively unreasonable in light of clearly established law at the time

of the relevant incidents.   Marcus, as a pretrial detainee, had a clearly established right to br

protected from harm. This right included the right to be continuously and appropriately monitored.

This right also included the right to have removed from his cell known items which are commonly

used by suicidal inmates to kill themselves, such as the drawstring in Marcus's pants.

80.    In the alternative, Officer Elbaum's conscious disregard, state of mind, subjective

belief, subjective awareness, or mental culpability is irrelevant to the determination of the

constitutional violation set forth in this section of this pleading. The United States Supreme Court,

in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any,

for officers sued in a case alleging excessive force against a pretrial detainee in violation of the

14th Amendment's Due Process Clause.   *Id.* at 2470-71.   Constitutional rights set forth in this

section of the pleading, and the constitutional right affording a pretrial detainee protection against

excessive force, both flow from the 14th Amendment's Due Process Clause.   *Id.*   Since such

constitutional protections flow from the same clause, the analysis of what it takes to prove such

constitutional violations should be identical.

81.    In *Kingsley*, a pretrial detainee sued several jail officers alleging that they violated

the 14th Amendment's Due Process Clause by using excessive force against him. *Id.* at 2470.  The

Court was determining the following issue: "whether, to prove an excessive force claim, a pretrial

detainee must show that the officers were *subjectively* aware that their use of force was

unreasonable, or only that the officer's use of that force was *objectively* unreasonable."   *Id*

(emphasis in original).  The United States Supreme Court concluded that only the objectively

unreasonable standard was the correct standard to be used in such excessive force cases, and that

the officer's subjective awareness was irrelevant.   *Id.*   The Court did so, acknowledging and

resolving disagreement among the Circuits. *Id.* at 2471-72.

82.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff

is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding, of the offending police officers for an episodic claim but instead instructed all federal courts to analyze officers' conduct on an objectively reasonable basis. There is no reason to treat pretrial detainees' right to protection differently.

83.     It appears that this standard is now the law of the land. Earlier this year, in *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.

84.     The majority opinion gave only three reasons for its determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent

because it would not have changed the results in *Alderson*. *Id*. Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Thus, the trail leads to only one place – an objectively unreasonableness standard, with no regard for Officer Elbaum's subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and simply apply an objective unreasonableness standard to claims in this case. There should be no subjective state of mind and/or conscious indifference standard necessary to be applied to Mr. Elbaum. The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

85.    Officer Elbaum is not entitled to qualified immunity. Officer Elbaum's failure to protect Marcus, total disregard for Marcus's health and safety, and total disregard for Marcus's suicidal tendencies and propensity to hurt himself caused, proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).

86.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas constitution, common law, and all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they

seek recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses;

- funeral expenses;  and

- exemplary/punitive damages.

87.    Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson.  The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum.  If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, Officer Elbaum's actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- loss of companionship and society that she would have received from her son, Marcus; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Marcus's constitutional rights.  Officer Elbaum's actions and inaction showed a

reckless or callous disregard of, or indifference to, Marcus's rights and safety.  Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

<u>Cause of Action Against Daniel C. Elbaum Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right not to be Punished as a Pretrial Detainee (Episodic Act of Omission)</u>

88.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Daniel C. Elbaum is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right not to be punished guaranteed by the 14th Amendment to the United States Constitution.  Pre-trial detainees are entitled not to be punished at all, according to the United States Supreme Court.  Officer Elbaum acted and failed to act under color of state law at all times referenced in this pleading. Officer Elbaum wholly or substantially ignored Marcus's suicidal tendencies and his obvious serious medical needs, and he was deliberately indifferent to those medical needs.  Officer Elbaum was not just aware, but well-schooled and thoroughly knowledgeable of Marcus's suicidal impulses due to multiple communications regarding those impulses, as well as the need for Marcus to take medication related to those impulses and his serious mental health issues.  He gained this knowledge through several direct communications with Marcus and Marcus's mother – Shelly Parham.  Marcus had a troubled and distraught demeanor while at the jail, although his demeanor as compared to all other information regarding prior suicides and his need for medication was a minor factor in knowledge gained by Officer Elbaum and the city regarding Marcus's suicidal tendencies.  Thus, he had subjective knowledge of the substantial risk of suicide and responded with deliberant indifference to that risk.  He was aware of the excessive risk to Marcus' health or

safety and was aware of facts from which an inference could be drawn of serious harm (and he in fact drew that inference). In fact, based on what occurred, it was more than an inference to Officer Elbaum. It was blatantly apparent. Officer Elbaum violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Marcus, as a pretrial detainee, had a clearly established right not to be punished. This right included the right to be continuously and appropriately monitored. Even so, Officer Elbaum refused to provide needed prescription drugs to Marcus, failed to monitor him, placed him in an isolated cell, and allowed him to retain a drawstring by which he could hang himself. Officer Elbaum's refusal to allow Marcus to obtain treatment and his placing Marcus into an isolated cell, unmonitored, for hours, while Marcus was suicidal and not in his right mind, constituted punishment. While the 8th Amendment to the United States Constitution prohibits cruel and unusual punishment of convicted inmates, the Constitution prohibits punishment at all of pretrial detainees. Even so, Officer Elbaum unconstitutionally punished Marcus.

89.     In the alternative, Officer Elbaum's conscious disregard, state of mind, subjective belief, subjective awareness, or mental culpability is irrelevant to the determination of the constitutional violation set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id.* at 2470-71. Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what it takes to prove such constitutional violations should be identical.

90.     In *Kingsley*, a pretrial detainee sued several jail officers alleging that they violated

the 14th Amendment's Due Process Clause by using excessive force against him. *Id.* at 2470. The Court was determining the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id* (emphasis in original). The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in such excessive force cases, and that the officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

91.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding, of the offending police officers for an episodic claim but instead instructed all federal courts to analyze officers' conduct on an objectively reasonable basis. There is no reason to treat pretrial detainees' right not to be punished differently.

92.    It appears that this standard is now the law of the land. Earlier this year, in *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at

419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.

93.     The majority opinion gave only three reasons for its determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Thus, the trail leads to only one place – an objectively unreasonableness standard, with no regard for Officer Elbaum's subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and simply apply an objective unreasonableness standard to claims in this case. There should be no subjective state of mind and/or conscious indifference standard necessary to be applied to Mr. Elbaum. The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

94.     Officer Elbaum is not entitled to qualified immunity. Officer Elbaum's punishing of Marcus, through denying reasonable medical care, total disregard for Marcus's health and safety, total disregard for Marcus's suicidal tendencies and propensity to hurt himself, and decision to place Marcus in an isolated and unmonitored cell to allow him to commit suicide, caused,

proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).

95.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas constitution, common law, and all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seek recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses;

- funeral expenses;  and

- exemplary/punitive damages.

96.     Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson.  The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum.  If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, Officer Elbaum's actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- loss of companionship and society that she would have received from her son, Marcus; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Marcus's constitutional rights. Officer Elbaum's actions and inaction showed a reckless or callous disregard of, or indifference to, Marcus's rights and safety. Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

### Cause of Action Against City of Burkburnett Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right as a Pretrial Detainee to Reasonable Medical Care (Conditions of Confinement)

97.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Burkburnett is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to reasonable medical care guaranteed by the Fourteenth Amendment to the United States Constitution. Claims in this section are typically referred to as "conditions of confinement" claims. According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate

indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers. Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for the official policy or practice Section 1983 claim is objective. Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015). Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. The City of Burkburnett acted or failed to act under color of state law at all relevant times. The City of Burkburnett's custom(s) or policy(ies) caused Marcus's death and the Plaintiffs' resulting damages. Chief Stahr was a policymaker for the City at all relevant times, and he was the chief policymaker at all such times for the police department (and the jail at which Marcus was incarcerated). In the alternative, the City Council for the City of Burkburnett was the chief policymaker at all times. Chief Stahr's and the City's failure to adopt, upon information and belief, a prisoner suicide policy was an intentional choice. This policy should include a broad number of topics and specific policies within it. Thus, the City was deliberately indifferent regarding its prisoners with suicidal tendencies. It had in place a general policy, referenced above, of checking on inmates every thirty minutes. The policy read that prisoners with suicidal tendencies "may require more frequent observation." This is in substance no policy at all, because it does not specify the frequency. This was a deliberate choice to violate constitutional rights, in light of at least two prior suicide attempts in the jail, by hanging, and Judge Goldberg's 1992 admonition. This policy, as well as the failure to adopt an appropriate policy, and related custom, were the moving forces behind the violation of Marcus's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.

98.     Also, upon information and belief, the City did not adequately train its police

officers to provide reasonable medical care to prisoners. A document received in an open records request indicates that training was done after Marcus died. This was far too late for Marcus. Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with at least two prior known attempted suicides) showed the callous and uncaring attitude of the City regarding rights of suicidal prisoners.

99.     The City also consciously chose not to purchase audio and video monitoring equipment which would allow it to monitor pretrial detainees in the cell block in which Marcus was incarcerated, including prior suicidal inmates and Marcus. The City knew that inmates would attempt to commit suicide in its cells, because it had happened on at least two and possibly more occasions prior to Marcus successfully committing suicide. The City's chose, policy, and practice of not securing, maintaining, and using such equipment showed deliberate indifference and conscious disregard for Marcus' constitutional rights. The City policy was to utilize funds for things other than audio and video monitoring equipment in the jail, and this was consistent with its practice of failing to monitor suicidal and/or severely mentally ill detainees.

100.    The City of Burkburnett's action, inaction, policies, and practices caused, proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson). Those actions and inaction violated Marcus's constitutional rights.

101.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code §

71.021), Texas constitution, common law,  and/or all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seeks recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses; and

- funeral expenses.

102.   Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson.  The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum.  If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, Officer Elbaum's actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;  and

- loss of companionship and society that she would have received from her son, Marcus.

Moreover, all Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

Cause of Action Against City of Burkburnett Under 42 U.S.C. § 1983 for Violation of
Marcus Johnson's 14th Amendment Due Process Right as a Pretrial Detainee to be Protected
from Harm (Failure-to-Protect Claim) (Conditions of Confinement)

103.    In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, Defendant City of

Burkburnett is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to

protection from harm guaranteed by the Fourteenth Amendment to the United States Constitution.

Claims in this section are typically referred to as "conditions of confinement" claims.  According

to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section

1983 claims based on official municipal policies is less stringent that the deliberate indifference

standard used for Section 1983 claims based on the isolated actions of individual policymakers.

Whereas the deliberate indifference standard for the actions of individual policymakers requires

subjective awareness of the inmate's serious medical condition, the deliberate indifference

standard for the official policy or practice Section 1983 claim is objective.  Such an objective

standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015).  Pretrial detainees are

entitled to be protected from harm.  The City of Burkburnett acted or failed to act under color of

state law at all relevant times.  The City of Burkburnett's custom(s) or policy(ies) caused Marcus's

death and the Plaintiffs' resulting damages.  Chief Stahr was a policymaker for the City at all

relevant times, and he was the chief policymaker at all such times for the police department (and

the jail at which Marcus was incarcerated).  In the alternative, the City Council for the City of

Burkburnett was the chief policymaker at all times.  Chief Stahr's and the City's failure to adopt,

upon information and belief, a prisoner suicide policy was an intentional choice.  This policy

should include a broad number of topics and specific policies within it.  Thus, the City was

deliberately indifferent regarding its prisoners with suicidal tendencies.  It had in place a general policy, referenced above, of checking on inmates every thirty minutes.  The policy read that prisoners with suicidal tendencies "may require more frequent observation."  This is in substance no policy at all, because it does not specify the frequency.  This was a deliberate choice to violate constitutional rights, in light of at least two prior suicide attempts in the jail, by hanging, and Judge Goldberg's 1992 admonition.  This policy, as well as the failure to adopt an appropriate policy, and related custom, were the moving forces behind the violation of Marcus's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.

104.    Also, upon information and belief, the City did not adequately train its police officers to protect prisoners from harm.  A document received in an open records request indicates that training was done after Marcus died.  This was far too late for Marcus.  Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with at least two prior known attempted suicides) showed the callous and uncaring attitude of the City regarding rights of suicidal prisoners.

105.    The City also consciously chose not to purchase audio and video monitoring equipment which would allow it to monitor pretrial detainees in the cell block in which Marcus was incarcerated, including prior suicidal inmates and Marcus.  The City knew that inmates would attempt to commit suicide in its cells, because it had happened on at least two and possibly more occasions prior to Marcus successfully committing suicide.  The City's chose, policy, and practice of not securing, maintaining, and using such equipment showed deliberate indifference and conscious disregard for Marcus' constitutional rights.  The City policy was to utilize funds for things other than audio and video monitoring equipment in the jail, and this was consistent with its practice of failing to monitor suicidal and/or severely mentally ill detainees.

106.    The City of Burkburnett's action, inaction, policies, and practices caused, proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).   Those actions and inaction violated Marcus's constitutional rights.

107.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.   Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), Texas constitution, common law,   and/or all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seeks recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses; and

- funeral expenses.

108.    Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).   She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson.   The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum.   If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.   Therefore, Officer Elbaum's actions caused, were the proximate cause of, and/or

were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;  and

- loss of companionship and society that she would have received from her son, Marcus.

Moreover, all Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

### Cause of Action Against City of Burkburnett Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right as a Pretrial Detainee not to be Punished (No Punishment) (Conditions of Confinement)

109.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Burkburnett is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right not to be punished guaranteed by the Fourteenth Amendment to the United States Constitution. Claims in this section are typically referred to as "conditions of confinement" claims. According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers. Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference

standard for the official policy or practice Section 1983 claim is objective. Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015). Pretrial detainees are entitled not to be punished at all, according to the United States Supreme Court. The City of Burkburnett acted or failed to act under color of state law at all relevant times. The City of Burkburnett's custom(s) or policy(ies) caused Marcus's death and the Plaintiffs' resulting damages. Chief Stahr was a policymaker for the City at all relevant times, and he was the chief policymaker at all such times for the police department (and the jail at which Marcus was incarcerated). In the alternative, the City Council for the City of Burkburnett was the chief policymaker at all times. Chief Stahr's and the City's failure to adopt, upon information and belief, a prisoner suicide policy was an intentional choice. This policy should include a broad number of topics and specific policies within it. Thus, the City was deliberately indifferent regarding its prisoners with suicidal tendencies. It had in place a general policy, referenced above, of checking on inmates every thirty minutes. The policy read that prisoners with suicidal tendencies "may require more frequent observation." This is in substance no policy at all, because it does not specify the frequency. This was a deliberate choice to violate constitutional rights, in light of at least two prior suicide attempts in the jail, by hanging, and Judge Goldberg's 1992 admonition. This policy, as well as the failure to adopt an appropriate policy, and related custom, were the moving forces behind the violation of Marcus's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.

110.    Also, upon information and belief, the City did not adequately train its police officers to take adequate measures to assure that prisoners like Marcus were not punished through refusing to provide medical care, refusing to allow administration of prescription medications necessary for appropriate mental health, and placing inmates in an isolated and unmonitored cell for hours when they had clear, recent, and contemporaneous suicidal tendencies. A document

received in an open records request indicates that training was done after Marcus died. This was far too late for Marcus. Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with at least two prior known attempted suicides) showed the callous and uncaring attitude of the City regarding rights of suicidal prisoners.

111.    The City also consciously chose not to purchase audio and video monitoring equipment which would allow it to monitor pretrial detainees in the cell block in which Marcus was incarcerated, including prior suicidal inmates and Marcus. The City knew that inmates would attempt to commit suicide in its cells, because it had happened on at least two and possibly more occasions prior to Marcus successfully committing suicide. The City's chose, policy, and practice of not securing, maintaining, and using such equipment showed deliberate indifference and conscious disregard for Marcus' constitutional rights. The City policy was to utilize funds for things other than audio and video monitoring equipment in the jail, and this was consistent with its practice of failing to monitor suicidal and/or severely mentally ill detainees.

112.    The City of Burkburnett's action, inaction, policies, and practices caused, proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson). Those actions and inaction violated Marcus's constitutional rights.

113.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), Texas constitution, common law, and/or all related and/or supporting caselaw.

Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seeks recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses; and

- funeral expenses.

114.    Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson. The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum. If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, Officer Elbaum's actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;  and

- loss of companionship and society that she would have received from her son, Marcus.

Moreover, all Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

<u>Causes of Action Against City of Burkburnett for Violation of
Americans with Disabilities Act and Rehabilitation Act</u>

115.    In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, the City of Burkburnett is

liable to the Plaintiff pursuant to the Americans with Disabilities Act ("ADA") and federal

Rehabilitation Act.   Upon information and belief, the City of Burkburnett has been and is a

recipient of federal funds.   Therefore, it is covered by the mandate of the federal Rehabilitation

Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate

persons with mental and physical disabilities in their facilities, program activities, and services,

and also reasonably modify such facilities, services, and programs to accomplish this purpose.

Further, Title II of the ADA applies to the City of Burkburnett and has the same mandate as the

Rehabilitation Act.  Claims under both the Rehabilitation Act and ADA are analyzed similarly.

116.    The City of Burkburnett jail/holding facility is a "facility" for purposes of both the

rehabilitation and ADA, and the jail's operation comprises a program and services for

Rehabilitation Act and ADA purposes.  Marcus Johnson was a qualified individual for purposes

of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical

condition that substantially limited one or more of his major life activities (and thus disabled).

Marcus was also discriminated against by reason of his disability.

117.    A majority of circuits have held, for purposes of Rehabilitation Act and ADA

claims, that one may prove intentional discrimination by showing that a defendant acted with

deliberate indifference.  The Fifth Circuit has declined to follow the majority view.  Nevertheless,

intent can never be shown with certainty.  Direct and circumstantial evidence can be used to

support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

118.   The City of Burkburnett's failure and refusal to accommodate Marcus's mental disabilities while in custody violated the Rehabilitation Act and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Marcus's death and the Plaintiffs' damages.

119.   The City of Burkburnett's violations of the Rehabilitation Act and the ADA included its failure to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Marcus's mental disabilities.  These failures and refusals, which were intentional, proximately caused Marcus's death and the Plaintiffs' damages.  Because Marcus's death resulted from the City of Burkburnett's intentional discrimination against him, the Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.  The Plaintiffs seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of the Plaintiffs' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and the ADA, and the Plaintiffs also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

## Conditions Precedent

120.   All conditions precedent to assertion of the Plaintiffs' claims have occurred.

## Use of Documents at Trial or Pretrial Proceeding

121.   The Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by the Defendants in this case in response to written discovery requests.

### Jury Demand

122.    The Plaintiffs demanded a jury trial in state court prior to removal of this case, and the Plaintiffs paid the appropriate fee.  The Plaintiffs' jury demand continues through removal, and despite this being an amended complaint, had never ceased.  The Plaintiffs once again hereby demand a jury trial on all issues which may be tried to a jury.

### Prayer

123.    For these reasons, the Plaintiffs ask that the Defendants be cited to appear and answer, and that the Plaintiffs have judgment for damages within the jurisdictional limits of the court and against the Defendants, jointly and severally, as legally applicable, for:

a)    actual damages of and for Shelly D. Parham individually including but not necessarily limited to the following:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus; and

- loss of companionship and society that she would have received from her son, Marcus;

b)    actual damages of and for the Estate of Marcus Johnson through its Independent Administrator Victor Hines III (ultimately the heirs-at-law of Marcus Johnson) including but not necessarily limited to the following:

- conscious pain and suffering; and

- funeral expenses;

c)    exemplary/punitive damages for all Plaintiffs from Daniel Elbaum;

d)      reasonable and necessary attorneys' fees for all Plaintiffs through trial and

any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983

and 1988, the ADA, and the Rehabilitation Act;

e)      court costs and all other recoverable costs;

f)      prejudgment and postjudgment interest at the highest allowable rates;  and

g)      all other relief, legal and equitable, general and special, to which the

Plaintiffs are entitled.

Respectfully submitted,

Law Offices of Dean Malone, P.C.

By: /s/ T. Dean Malone

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:       (214) 670-9904

Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2017 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

Ashley D. Dierker
Taylor, Olson, Adkins, Sralla, & Elam, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107

Daniel R. Barrett
Taylor, Olson, Adkins, Sralla, & Elam, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107

Wayne K. Olson
Taylor, Olson, Adkins, Sralla, & Elam, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107

Joe Tooley
Tooley Law
510 Turtle Cove #112
Rockwall, Texas 75087

/s/ T. Dean Malone
T. Dean Malone