UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| SHELLY D. PARHAM, individually, and VICTOR HINES III, as independent administrator of, and on behalf of, the ESTATE OF MARCUS JOHNSON,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>CITY OF BURKBURNETT; DANIEL C. ELBAUM; MATTHEW C. MCDONALD; and ZACHARY D. LEONARD,<br><br>　　　　Defendants. | § § § § § § § § § § § § § § § § | CIVIL ACTION NO.<br>7:17-CV-00036-M |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

> **This is a tragic unnecessary case of suicide resulting from flagrant violation of constitutional rights. The Defendants arrested and incarcerated Marcus Johnson, a young man in his early twenties. Patrol officers Elbaum and McDonald, and Sergeant Leonard, were well aware of Marcus's suicidal tendencies and propensity to hurt himself. Even so, the Defendants chose not to monitor Marcus and assure that he did not commit suicide. Instead, the Defendants chose to ignore Marcus, and leave him alone, locked in a cell, for over two hours. Not surprisingly, Marcus committed suicide, alone, isolated, and with no one to help.**



TO THE HONORABLE JUDGE OF SAID COURT:

The Plaintiffs file this complaint and for cause of action will show the following. The Plaintiffs intend that this pleading amend, and thus replace, the Plaintiffs' First Amended Complaint.

<u>Parties</u>

1.      Plaintiff Shelly D. Parham ("Ms. Parham") is a natural person who resides and did reside in Texas at all relevant times. Ms. Parham was Marcus Johnson's legal and biological mother. Marcus Johnson is referred to herein at times as "Mr. Johnson" and/or "Marcus."

2.      Plaintiff Victor Hines III ("Mr. Hines"), as the Independent Administrator of the Estate of Marcus Johnson, acts in that capacity and files this lawsuit asserting claims in that capacity and on behalf of the estate. Letters of independent administration were issued to Mr. Hines on or about January 19, 2017, in Cause Number 31158-F, in the County Court at Law Number 2 of Wichita County, Texas, in a case styled *In the Matter of the Estate of Marcus Donavon Johnson, Deceased.*

3.      Defendant City of Burkburnett ("City of Burkburnett") is a Texas incorporated municipality/city. City of Burkburnett was served with process and has made an appearance in this case. City of Burkburnett acted or failed to act at all relevant times through its employees, agents, representatives, and/or police officers and is liable for such actions and/or to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Rehabilitation Act, and the Americans with Disabilities Act). City of Burkburnett's policies, practices, and/or customs were the moving force behind constitutional violations, and resulting damages, referenced and asserted in this pleading.

4.     Defendant Daniel C. Elbaum ("Mr. Elbaum" or "Officer Elbaum") is a natural person who was served with process and has made an appearance in this case. Mr. Elbaum is being sued in his individual capacity and acted at all relevant times under color of state law. Mr. Elbaum was employed as a City of Burkburnett police officer at all such times and acted or failed to act in the course and scope of his duties.

5.     Defendant Matthew C. McDonald ("Mr. McDonald" or "Officer McDonald") is a natural person who resides in Texas and may be served with process at City of Burkburnett Police Department, 208 East 4th Street, Burkburnett, Texas 76354. Mr. McDonald may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. McDonald at Mr. McDonald's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. McDonald is being sued in his individual capacity and acted at all relevant times under color of state law. Mr. McDonald was employed as a City of Burkburnett police officer at all such times and acted or failed to act in the course and scope of his duties.

6.     Defendant Zachary D. Leonard ("Mr. Leonard" or "Sergeant Leonard") is a natural person who resides in Texas and may be served with process at City of Burkburnett Police Department, 208 East 4th Street, Burkburnett, Texas 76354. Mr. Leonard may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Leonard at Mr. Leonard's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Leonard is being sued in his individual capacity and acted at all relevant times under color of state law. Mr. Leonard was employed as a City of Burkburnett police officer at all such times and acted or failed to act in the course and scope of his duties.

Jurisdiction

7.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and federal statutes including but not necessarily limited to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.  The Plaintiffs do not, by including the following sentence, assert, stipulate, or allege any state law claims.  However, to the extent any such claims are alleged or construed to be alleged in this pleading, the court has supplemental jurisdiction over any such claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims within the court's original jurisdiction that they and the claims within the court's original jurisdiction arise from a common nucleus of operative fact and form part of the same case or controversy under Article III of the United States Constitution.

8.     The court has personal jurisdiction over City of Burkburnett because it is a Texas municipality.  The court has personal jurisdiction over the natural person Defendants because they reside in and are citizens of Texas.

Venue

9.     Venue is proper in the Wichita Falls Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because it is the division and district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

Factual Allegations: Life, Incarceration, and Death of Marcus Johnson

10.     The Plaintiffs provide in this factual allegations section the general substance of certain factual allegations.  The Plaintiffs do not intend that this section provide in detail, or

necessarily in chronological order, any or all factual allegations.  Rather, the Plaintiffs intend that this section merely provide the Defendants fair notice of the general nature and substance of some of the Plaintiffs' factual allegations.

11.     Marcus was born in 1993, in Oklahoma City, to Shelly Parham and Kendrick Johnson.  He attended Anadarko School, and lived in Anadarko until moving to Wichita Falls in about December 2014.  Marcus was severely emotionally and mentally troubled, but he battled those issues the best he could.  He was a member of, and active in at times, a Wichita Falls church. Marcus enjoyed fishing, writing, and helping others.  He wanted to study psychology and help people who were mentally ill and/or battled addiction.




12.     Marcus had a special place in his heart for his mother and wrote the following poem for her about a week before he died:

> Mom you are the one who always loved me through good and bad
> No matter if I failed you or made you sad
> I thank you for your undying Love
> that you have given me.
> You may not have thought I noticed but I always
> knew you loved me.
> The Past is the past and I forgive you for everything you
> thought you did wrong.
> I'm just thankful to God that he chose you as my mom.
> You'll never know how much I Love You and what
> You mean to me.
> There are no amount of words to explain this from me.
> Just know that I Love You and I promise I always will Forever. And today,
> I just wanted you to know that I wouldn't want it any other way.
> Love You Marcus DJ.

13.     On March 10, 2016, Marcus was with two friends/acquaintances in a car, in Burkburnett, and the car was parked near a mobile home. Apparently, someone in the mobile home had called police regarding what may have ultimately been a dispute about purchase of baby clothes and/or some other relatively minor issue. Police officers requested identification from Nolan Brown, Myra Brown, and Marcus. Marcus provided a Texas identification card which the police officers alleged was fake. The police officers did their best to attempt to find contraband for which they could arrest Marcus or one of the two other people – without success. They found no guns, and no illegal drugs. They were unable to determine that any of the three people had committed a crime at all, much less committed any illegal conduct alleged by the caller in the mobile home. Police released Nolan Brown and Myra Brown at the scene but chose to arrest Marcus and transport him to the City of Burkburnett jail for the allegedly fake identification card they forced him to produce. After much confusion between the police officers, extending to a period of time during which Marcus was ultimately incarcerated, police officers decided that Marcus had been arrested for allegedly "violating" Texas Penal Code Section 32.21(e)(2).

However, Marcus was not guilty of forgery, and his actions and/or inaction did not meet the elements of the crime.[1] Nevertheless, City of Burkburnett Police Officers Elbaum and McDonald, together with Sergeant Leonard, acted jointly in arresting and/or detaining Marcus. Officer Elbaum then drove Marcus, under arrest, to the City of Burkburnett jail.



14.     At approximately 6:18 p.m., Officer Elbaum arrived at the City of Burkburnett Police Station with Marcus under arrest and in a police vehicle. He parked near the back door. About one minute later, at approximately 6:19 p.m., Officer Matt McDonald and Sergeant Zac Leonard arrived at the Burkburnett Police Department, parking in front of the building. All police officers (including the police chief) mentioned in this pleading were police officers acting or failing to act in the course and scope of their duties for City of Burkburnett at the referenced times and under color of state law.

---

[1] Despite the officers' determination to apply the referenced Penal Code section, confusion as to Marcus's alleged crime continued well after he died, and up to the few seconds before he was discovered, deceased, in the cell in which the Defendants incarcerated him. Officer McDonald can be seen in a video recording intently discussing with another law enforcement officer how and whether elements of the alleged crime were met. This continued discussion among officers of what should have been alleged minor infraction, together with all other events referenced in this pleading, bring to mind the Keystone Cops. Unfortunately, this is no comedy.

15.     At approximately 6:20 p.m. Officer Elbaum took Marcus into the back door of the police department and into the book-in area.   Officer Elbaum removed Marcus' handcuffs, searched him, and began doing book-in paperwork.   Sergeant Leonard and Officer McDonald entered the police department through the front door at about the same time.   Officer McDonald went in to the book-in area.

16.     At approximately 6:21 p.m., Officer McDonald went to the lobby to address any walk-in people.   Officer Roy Mullens arrived at the police station at about the same time, and he entered the building through the front door.

17.     At approximately 6:23 p.m., Officer Mullens entered the lobby where Officer McDonald was present.   Approximately one minute later, at approximately 6:24 p.m., Officer Mullens left the lobby.   Officer McDonald also left the lobby at about the same time and walked back into the police department.   At approximately 6:25 p.m., Officer McDonald left the police department.

18.     At approximately 6:27 p.m., Officer Elbaum asked medical questions on the City of Burkburnett Police Department book-in form.   That form required Officer Elbaum to ask about issues including prior suicide attempts and mental disorders, and to ask to whether Marcus was or appeared to be suicidal, homicidal, or delusional.   At approximately 6:28 p.m., after Officer Elbaum asked Marcus if he ever attempted suicide, Officer Elbaum learned of Marcus' significant, ongoing, and very recent suicidal tendencies and impulses.   Marcus was suicidal at the time he was being interviewed by Officer Elbaum.   Marcus responded that he had attempted to commit suicide.   Officer Elbaum asked how many times Marcus had attempted to commit suicide, and Marcus replied, "Like three."   Officer Elbaum asked when was the last time that Marcus attempted to commit suicide.   Marcus told Officer Elbaum that he had attempted to commit suicide only three weeks prior to that time.   Officer Elbaum asked Marcus whether he went to the hospital.   Marcus

told him that he went to the state hospital because he tried to cut himself. Officer Elbaum knew that the "state hospital" meant that Marcus had been committed due to his attempted suicide. Officer Elbaum knew that Marcus's suicidal tendencies were extreme and serious enough that he had to be institutionalized at a governmental hospital. Officer Elbaum asked Marcus how he attempted to commit suicide, and Marcus pointed to his inner elbow, said "cut my," and showed a scar to Officer Elbaum. Thus, Officer Elbaum knew that Marcus had used a sharp object and attempted to cut his arm in a manner that would cause him to "bleed out" and die.

19.     At approximately 6:29 p.m., Marcus gave a list of his mental health issues, problems, and/or conditions to Officer Elbaum. Officer Elbaum checked "Suicide Attempts" on the Booking Information form, and wrote next to it "X3 – last 3 wks ago – cut arm." He also checked on the same form the box for "Mental Disorders" and wrote next to it "Depression, Anger Mgmt., Bipolar."



20.     Officer Elbaum indicated at one point during the conversation that he knew that Marcus had mental disorders because he was cutting himself. Officer Elbaum told Marcus in substance that Officer Elbaum had worked in the "medical field of other mental illnesses" [sic] (according to a City of Burkburnett Police Department internal investigation document). Upon information and belief, Officer Elbaum was communicating to Marcus that he fully understood mental health issues which Marcus was experiencing, including his propensity to commit suicide and/or otherwise cause himself serious harm. Officer Elbaum knew, with three prior suicide

attempts, the last of which occurring only three weeks prior to Officer Elbaum arresting Marcus, and with visible evidence of a recent cut on Marcus' arm, that Marcus was likely to attempt to kill himself while in custody.  Officer Elbaum knew that the likelihood of Marcus attempting to kill himself while in custody was increased due to mental disorders described as "depression," "anger management," and "bipolar."  Officer Elbaum knew that depression combined with prior suicide attempts (one of which being very recent), and anger management issues combined with the effects of bipolar disorder, resulted in an extreme degree of risk that Marcus would serious hurt and/or kill himself while in custody.

21.     Further, Officer Elbaum began working for Grayline Research Center (formerly known as MRC Geriatric Services) in January 1991, ultimately becoming a certified clinical research coordinator.  According to the website for that company, it conducts clinical drug trials including trials related to depression (including Bipolar 1 Depression).  Officer Elbaum's mother had purchased the company prior to Officer Elbaum working there, and Officer Elbaum learned significant information while working for Grayline Research Center which further solidified his knowledge that Marcus was likely to kill and/or seriously harm himself while in custody.

22.     Grayline Research Center was a medical clinic that diagnosed individuals with Alzheimer's disease.  It was run by a psychiatrist, who also had his own private practice within the company.  The company also conducted clinical research studies on individuals who suffered from Alzheimer's disease.  When Officer Elbaum was first hired, for just approximately the first six months, he performed janitorial services.  He then slowly worked his way into the clinical research aspects of the business.  He worked as a lab technician and became a certified phlebotomist. He drew blood and processed blood specimens.  He prepared blood specimens for shipment to outside labs for analysis.  Officer Elbaum began working full time at Grayline Research Center when he began working as a lab technician.

23.     Officer Elbaum knew that every clinical study at Grayline Research Center was governed by a protocol. He knew that the protocol would outline very specific actions that must occur during the course of a patient's visit. He knew that the protocol was written by a pharmaceutical company, and that there were normally physicians involved in writing the protocol.

24.     Officer Elbaum's medical knowledge and abilities were such that, after he drew blood at Grayline Research Center, he knew that he might have to centrifuge the blood down to white blood cells. Officer Elbaum would also process stool samples. He knew that he would smear fecal material onto a slide, and then a developing film would be placed onto it. The color would then determine whether there was blood in the fecal material. Upon information and belief, Officer Elbaum learned other medical information from his mother, who has been a registered nurse for almost all of her adult life.

25.     As Officer Elbaum progressed in his lengthy work history with Grayline Research Center, he began to learn more about what was involved in clinical research and actually began working directly with the physician. The physician put Officer Elbaum through a training program, so that he could learn to be a medical assistant. Officer Elbaum learned how to collect vital signs, including blood pressure and pulse rate. He learned how to administer electrocardiograms.

26.     In addition to Officer Elbaum's work with the Alzheimer's diagnostic clinic at Grayline Research Center, he later began transcribing the psychiatrist's notes. Officer Elbaum learned significant additional information regarding psychiatric and mental health issues, as well as physiological issues, through transcription of the psychiatrist's dictation. The psychiatrist would go through very specific information – elements, review of symptoms, psychiatric history, medical history, current medical conditions, and medications. Officer Elbaum did hundreds of transcriptions, over six to seven years. He thus learned about depression, anger management

issues, and bipolar disorder, and how such problems affected people in their day-to-day lives. He learned about the specific medications which Shelly Parham told him Marcus needed to take, as well as the purpose for the taking of such medications and the physical and mental maladies which persons who took such medications were attempting to remedy.

27. Officer Elbaum agrees that he learned "a lot" through just listening to the doctor dictating things for transcription. Officer Elbaum learned a lot of medical technology, and he learned a lot about medications.

28. Officer Elbaum also learned at the Grayline Research Center how to become a certified clinical research coordinator. As a clinical research coordinator, Officer Elbaum's job function was to manage a study for a major drug company. Such management would require that Officer Elbaum have sufficient knowledge about, and implement, the specific protocols set forth by physicians at such a major drug company. Officer Elbaum knew that lab assessments and physical and mental assessments had to be completed. Officer Elbaum was well-versed in completing documents provided by drug companies, related to study subjects, and regarding such subjects' physical and mental health.

29. Officer Elbaum further evidenced his extensive medical knowledge when volunteering nonresponsive information in response to questions during his deposition. Officer Elbaum testified that, at the time Officer Elbaum learned that Marcus had to take lithium, Officer Elbaum understood that to be a drug for bipolar disorder. He also testified that he understood what somebody meant when they used the phrase "bipolar disorder." He testified that he understood that such a person had fluctuations in their mood, which could be severe depending on the type of bipolar disorder. When asked if he had any understanding as to how those fluctuations could manifest themselves in a person, he said, "I mean, I don't want to go through the whole DSM with you." When asked what was the DSM, Officer Elbaum responded, "It's the Diagnostic and

Statistical Manual for psychiatric conditions." Officer Elbaum also testified that psychiatrists used the DSM, and that he had become familiar with it through "the doctors that [he] worked with." When asked what level the DSM was on the date of Officer Elbaum's December 20, 2017 deposition, he said flatly, "Five." He also testified that he knew that prior to DSM level 5, DSM was level 4 with text revision. Thus, Officer Elbaum clearly still kept up with the DSM long after Marcus was deceased. He also admitted that he became familiar with the DSM while working at Grayline Research Center, and that he knew that the DSM lists disorders that are used by neuropsychologists, psychologists, and psychiatrists.

30.     Officer Elbaum worked at Grayline Research Center from January 1991 until May 2005. Officer Elbaum was then laid off from the company, because he had an issue with a co-worker. Officer Elbaum then went back to work for Grayline Research Center in January 2008 and worked until approximately July 2008. He then worked at Grayline Research Center from July 2011 until 2013. Finally, he worked for Grayline Research Center from May 2014 through June 2015. Officer Elbaum was a full-time employee at Grayline Research Center from approximately the summer of 1991 until June 2015, for above-referenced time periods. Officer Elbaum thus took his extensive medical, psychiatric, and mental healthcare knowledge and experience with him to the Burkburnett Police Department. Unfortunately, he chose not to use that knowledge and experience when dealing with Marcus.

31.     Officer Elbaum showed unabashed, conscious disregard for Marcus's reasonable medical needs, and chose to disregard and be deliberately indifferent to all information obtained during the interview regarding Marcus's suicidal tendencies and impulses and his desire to harm himself. Officer Elbaum chose to disregard his own experience and knowledge regarding the high likelihood – certainty – that Marcus would kill and/or seriously harm himself. Instead of meeting Marcus's needs, he intentionally placed Marcus into an environment in which Marcus could finally

complete what he had attempted before – the taking of his own life. Officer Elbaum chose to put Marcus into a cell, alone and isolated, with clothing that contained a drawstring that would enable Marcus to hang himself. Officer Elbaum knew with virtual certainty that placing Marcus into a cell, with his history of mental disorders and other issues mentioned above, would result in Marcus not leaving the jail alive.

 

32.     At approximately 6:33 p.m., Sergeant Leonard entered the main hallway. He opened a door for a male subject and allowed him to enter the main hallway.

33.     At approximately 6:34 p.m., Officer Elbaum escorted Marcus to a cell. Marcus asked to make a phone call, and Officer Elbaum brought Marcus back to the book-in area. Officer McDonald arrived at the police station and entered the building.

34.     At approximately 6:35 p.m., Officer McDonald walked into the book-in area. The male subject to which Sergeant Leonard was speaking left the police department. Sergeant

Leonard walked back toward dispatch, then back into the hallway, and then into the Sergeant's office. Marcus called his mother, Shelly Parham. Texas Ranger Toby Catlin, who would ultimately conduct an investigation of Marcus's death, lists this call as being at approximately 6:30 p.m. Ranger Catlin notes that, during that phone call, while Marcus was on the phone with Shelly Parham, Marcus stated to Officer Elbaum that Marcus did not have his medication. Officer Elbaum consciously chose to disregard Marcus' request for medication which would assist him with his severe mental disorders and suicidal tendencies. Officer Elbaum instead chose to let those severe mental issues take their course and result in Marcus' suicide.

35.     Officer Mullens arrived at the police department and spoke to people in the lobby. At approximately 6:36 p.m., Officer McDonald walked into Sergeant Leonard's office. At approximately 6:38 p.m., Officer McDonald exited Sergeant Leonard's office and went back to the book-in area.

36.     Officer Elbaum called Marcus's mother at a number provided by Marcus. Marcus began crying within the first few seconds of the phone call and asked the person who answered the phone, "Where's my mom at?" When asked why he was crying, he said, "Cause I'm in jail!" Officer Elbaum can hear at least Marcus's side of the telephone call in which Marcus, still crying and visibly and audibly upset, says that he told the officers that the alleged fake I.D. was obtained from the Oklahoma DMV.

37.     It was apparent to Officer Elbaum, based upon his years of experience dealing with people with mental health issues, as well as being an adult of his age, that Marcus sincerely believed that the alleged fake I.D. was obtained from the Oklahoma Department of Motor Vehicles. This was yet another clear sign to Officer Elbaum that Marcus was not in his right mind.

38.     Shelly told Marcus that he was "mental," and that he needed his medicine. Marcus parroted that information to Officer Elbaum, "I'm mental. I need my medicine." Ms. Parham also

said, "They're going to take you to the State hospital if you don't have your medicine. You're on medication that you must have." Marcus once again parroted the information to Officer Elbaum, "She says I need to go to the State hospital or something." Marcus asked Officer Elbaum, "What's the process," while crying. His mother told him to stop crying.

39.     At one point during the conversation, Officer Elbaum said, "Don't get hysterical, or I'm gonna make you hang up, okay?" Officer Elbaum recognized that Marcus had significant mental and emotional issues, Marcus being what Officer Elbaum considered to be "hysterical" during a telephone call with his mother over a relatively minor alleged offense. This was yet another part of the mountain of evidence with which Officer Elbaum was confronted prior to incarcerating Marcus with the means to kill himself.

40.     Officer McDonald was present for a significant portion of that phone conversation, and he also observed Marcus in a distraught state. A video recording shows Officer Elbaum grinning and smiling while talking to Officer McDonald, being deliberately indifferent to a severely mentally ill young man in the room with both of them. Officer Elbaum, throughout the evening, was more concerned with impressing his senior officers than with fulfilling his constitutional duties as a police officer, with charge over an incarcerated young man who had the mind of a boy.

41.     At approximately 6:39 p.m., Marcus ended his telephone call with his mother, which was the last time he was ever able to speak to her, and he was escorted to his isolated and unmonitored jail cell by Officer Elbaum. Officer Elbaum chose to ignore Marcus, leaving him alone in his cell for hours, with full knowledge that Marcus would likely attempt to significantly harm and/or kill himself, and with the physical ability to do so through use of a drawstring in his pants. He showed a total and conscious disregard, and deliberate indifference, for Marcus's safety and medical needs. He also failed to provide any reasonable accommodation for Marcus's medical

needs. In fact, he provided no accommodation whatsoever for Marcus's significant medical needs, his mental health issues, and his suicidal tendencies. Instead, he provided Marcus isolated accommodations in which Marcus would fulfill his unfortunate destiny.

42.    Officer McDonald was at all times, while he was present at the police station on the night Marcus died, Officer Elbaum's senior officer. Thus, when Sergeant Leonard left the station for any period of time during that evening, Officer Elbaum would report to and should follow instructions of Officer McDonald. Officer McDonald was Officer Elbaum's senior officer due solely to seniority. Both officers had the rank of patrol officer. When Sergeant Leonard was present at the police station during that evening, he outranked both Officer Elbaum and Officer McDonald. During that time period, Officer Elbaum and Officer McDonald would report to and should follow instructions of Sergeant Leonard.

43.    Officer Elbaum and Officer McDonald straightened up the book-in room. Officer Elbaum then grabbed the Booking Information form, which had been sitting on the desk after it had been completed and signed by Officer Elbaum and Marcus, and walked out of the room with Officer McDonald. Officer Elbaum and Officer McDonald walked toward a door at the end of the hallway which would lead to Sergeant Leonard's office. Officer Elbaum stopped Officer McDonald while walking down the hallway, Booking Information form in hand, and demonstrated to Officer McDonald once again his knowledge of medication. Officer Elbaum was more concerned about demonstrating his experience and knowledge of medication to impress Officer McDonald than he was using the information on the form in his hand to save a young man's life.

44.    Officer Elbaum told Officer McDonald that, if one of the pills found at the arrest scene would have had the number "4432" instead of "4436" imprinted on it, it would have been hydrocodone. The two officers then went to the end of the hallway and turned left into Sergeant Leonard's office. At least Officer Elbaum, Officer McDonald, and Sergeant Leonard were in

Sergeant Leonard's office at that time. Only approximately ten seconds after demonstrating his hydrocodone knowledge to Officer McDonald, and less than one minute after putting Marcus into a cell, alone and unmonitored by any person or any video equipment, Officer Elbaum, using a sarcastic and cocky tone, said to, and in the physical presence of, Officer McDonald and Sergeant Leonard:

> The biggest pansy you've ever seen. We need to take him to the State hospital. He's crying his eyeballs out. His mama says it's aaalll legit! He said he got it from the Oklahoma DMV. [laughter of likely Sergeant Leonard and/or Officer McDonald in response].

Upon information and belief, Sergeant Leonard then said in substance, and joking, "How can you obtain a Texas identification card from the Oklahoma Department of Motor Vehicles?" Officer Elbaum, after a few more comments by, upon information and belief, Sergeant Leonard, said in substance that he would like to get an I.D. from somewhere "cool" "like North Dakota or something." After a few more sarcastic comments regarding Marcus, who was distraught in his cell, ready to commit suicide, Sergeant Leonard spoke to Officer Elbaum about, upon information and belief, a prior arrest record of Marcus which Sergeant Leonard found through either a phone call or an online database. He was able to determine such information, upon information and belief, because Officer Elbaum handed the Booking Information form to Sergeant Leonard when Officer Elbaum and Officer McDonald walked into Sergeant Leonard's office. Officer McDonald also looked at the Booking Information form at that time, and he also took possession of the Booking Information form for processing purposes and/or to make one or more copies of it. Officer Elbaum then said in substance:

> I've seen that kid somewhere before. I'm telling you. I've seen him in town. I don't know if it was a traffic stop or what. I remember the tattoos – the ones over his eyebrows. And the tears on his right cheek. I've seen him before. It's weird he's never been here before, but I'm telling you there's something squirrelly about him. He's crying like a baby back there right now. He's crying talking to mama – crying his eyeballs out. Saying he needs his medicine. I'm like, I'm not a doctor.

I don't give you medicine.  I said if you needed medicine you'd have medicine on
you.  You didn't have any medicine on you.

Officer Elbaum then gave his best sarcastic impression of a crying baby, and the sound that such

a baby would make.  He felt like a big man in front of his superiors, and they all enjoyed a laugh

at Marcus's expense.

45.     Officer Elbaum then said what he had told Marcus before (demonstrating that

Sergeant Leonard was in charge): "We're conducting an investigation right now, and the Sergeant

will make a determination of what we're gonna do here.  Right now you're in custody."

46.     Officer Elbaum acted with unabashed deliberate indifference, making fun of a

mentally ill young man who had attempted to commit suicide multiple times before.  Officer

Elbaum tried to impress his superior officers and show his manly superiority to Marcus, making

sounds like a baby.  Regardless, and material for claims against the three Defendant police officers,

he acknowledged that Marcus needed his medication, acknowledged that Marcus needed to go to

a mental institution, and acknowledged clearly and unambiguously that Marcus was not acting like

a reasonable person or one without serious medical issues.  Twenty-two-year-old young men do

not act as Marcus did, when potentially being charged with a "fake I.D." offense unless they have

significant emotional problems.  Sergeant Leonard and Officer McDonald possessed this

information, because it was stated to them directly.  They also read the Booking Information form.

Even so, the three police officers chose to feed their own egos at Marcus's expense, and at the cost

of his life.  They were deliberately indifferent to his serious mental health needs.

47.     Moreover, Officer Elbaum testified at his deposition that both Officer McDonald

and Sergeant Leonard looked at documents in the folder containing documents regarding Marcus

(including the Booking Information form).  Thus, both Officer McDonald and Sergeant Leonard

possessed the same information regarding Marcus, and his serious mental health issues, which

Officer Elbaum possessed. Importantly, Officer McDonald and Sergeant Leonard possessed this information less than two minutes after Marcus was incarcerated in a cell, alone, and unmonitored, and hours before Marcus died. Thus, all three officers, possessing the same information, had the ability to do something about Marcus. They had the ability to ensure continuous monitoring. They had the ability to transfer Marcus out of the jail facility to a mental health facility where he could be protected and assisted.[2] They had the ability to remove clothing from Marcus's cell, such as his pants with the drawstring, with which Marcus could hurt himself. Instead, they did nothing. They were deliberately indifferent to Marcus and his intention to kill himself. Sergeant Leonard was concerned about his scheduled off-time, because he had to play a softball game in Wichita Falls. As a result, he shirked his responsibility as a supervisor in a manner that was a direct, proximate, and producing cause of Marcus's death. The same is true of Officer McDonald who, after Sergeant Leonard left the police station, failed to take any action to assure that Marcus did not kill himself.

48.     At approximately 6:43 p.m., Officer Elbaum entered the book-in area and sat down at a computer. Upon information and belief, Officer Elbaum was doing nothing important on the computer as compared to Marcus's vital and emergency needs. Officer Elbaum should have been continuously observing Marcus, but instead he sat at a computer. About two minutes later, at

---

[2] The City of Burkburnett produced in response to discovery requests in this case a form entitled "Emergency Detention Order." All three Defendant officers knew that they could complete the Emergency Detention Order form if they could affirm to the following:

> I have reason to believe, and do believe, that the aforementioned patient evidences mental illness and poses a substantial risk of serious harm to self or others unless immediately restrained, and I believe that there is insufficient time to obtain a warrant before taking said patient into custody.

The form also contains a space allowing the police officer to provide specific information underlying his or her beliefs "derived from specific recent behavior, overt acts, attempts, or threats that were observed by or reliably reported to me articulated" in the form. The form also includes a section for the listing of persons "who witnessed any of the patient's behavior" described in the form. The form is one page, and it would take three-to-four minutes for someone to complete it. The form has attached to it an information sheet for Burkburnett Police Department officers which contains the full text of Sections 573.001, 573.002, and 573.025 of the Texas Mental Health Code.

approximately 6:45 p.m., Officer Mullens entered through a secure door when walk-in people he had been addressing left the police department.

49.    At approximately 6:46 p.m., Officer Elbaum left the book-in area. Approximately six minutes later, at approximately 6:52 p.m., Officer Mullens left the police department to respond to a call.

50.    At approximately 6:54 p.m., Officer Elbaum entered the book-in area and sat at a computer. Once again, while Officer Elbaum sat at a computer doing, upon information and belief, nothing comparatively important, he chose to leave Marcus in his cell, alone, and unmonitored, so that Marcus could fulfill the unfortunate desire which he was led to fulfill as a result of his severe mental illness. Approximately three minutes later, at approximately 6:57 p.m., Sergeant Leonard told dispatch that he was 10-42 (ending his shift). He then exited the building to play softball in Wichita Falls, leaving Officer Elbaum and Officer McDonald to fend for themselves. Sergeant Leonard was in charge, and with the knowledge he had of and about Marcus, he should have taken immediate action instead of leaving junior officers to deal with the situation. Officer Leonard would later write, in his statement, that he exited the police department and ended his shift at approximately 6:30 p.m. Officer Elbaum exited the book-in area and went into the officer's office. At approximately 6:59 p.m., Officer Elbaum once again entered the book-in area and sat at a computer. Officer Elbaum apparently continued doing nothing comparatively important. He continued choosing to totally disregard Marcus and his severe and apparent medical and mental health needs, such that Marcus would be able to commit suicide. Marcus remained isolated, alone, and unmonitored.

51.    At approximately 7:00 p.m., Officer Mullens returned to the police station. Further, at approximately that time, listed as approximately 7:03 by Ranger Catlin, Shelly Parham called the police station and spoke to, upon information and belief, dispatcher Mary Keller. Marcus had

been in his jail cell, unmonitored, at this point for approximately twenty minutes. Upon

information and belief, no one had observed him or checked on him during that period of time.

Moreover, in addition to all the information Officer Elbaum had already received about Marcus's

suicidal tendencies, and critical need for healthcare, the Department learned again about Marcus's

need for his medications. The following conversation, in substance, occurred:

| | |
|---|---|
| Dispatcher: | Police Department. |
| Shelly Parham: | Hi. I'm calling – they brought my son in, his name's Marcus Johnson. |
| Dispatcher: | Okay. |
| Shelly Parham: | And my question, I have a question, cause, well, he takes three different kind of medications. Psychosis medications. And I didn't know if they were gonna keep him or what was gonna happen. Actually, he had an I.D. |
| Dispatcher: | Okay. Can you hold on for just one second, please? |
| Shelly Parham: | Thank you. |

52.     The dispatcher then placed Ms. Parham on hold, and the following conversation

between the dispatcher and Officer Elbaum ensued:

| | |
|---|---|
| Dispatcher: | This is Marcus Johnson's mother.  She probably wants to talk to a . . . |
| Officer Elbaum: | Unintelligible. |
| Dispatcher: | Um, when Leonard left, I think he said that Johnson...that McDonald was taking over, but I don't know. |
| Officer Elbaum: | Is that what he said? |
| Dispatcher: | I don't know.  He said McDonald had it handled is what he said to me.  It wasn't that particular case maybe?  Just that he had it handled is all he said to me last night.  I said alright. Hey, but this is the mother on the phone. |
| Officer Elbaum: | Mother of? |
| Dispatcher: | Marcus Johnson. |
| Officer Elbaum: | Tell her we're all dispatched out. |
| Dispatcher: | Okay. Well, she said he . . . takes three medications. |
| Officer Elbaum: | [Unintelligible] we can't give him any medication. |
| Dispatcher: | Do I tell her that or do I just tell her . . . |
| Officer Elbaum: | Tell her that just that no officers are available. |

The dispatcher then lies as instructed by Officer Elbaum, returning to the conversation with Shelly

Parham.  The dispatcher asks for Ms. Parham's name and number and says that there were no

officers available to talk to her.  The dispatcher also confirmed that Marcus had been booked-in.

During the latter part of the telephone conversation, Ms. Parham told the dispatcher, "We live in

Wichita Falls and if so. . . I'd have to bring his meds before I go to work.  He's on three different

kinds of meds that he has to take."  The dispatcher then told Shelly Parham that she would let the

officers know, and that one of them would call her back.

53.   While the dispatcher was talking to Ms. Parham on the phone, the following was

said between officers:

| | |
|---|---|
| Officer: | Elbaum! |
| Officer Elbaum: | Yeah. |
| Officer: | Hey, the mother's on the phone.  Do you want to talk to her [unintelligible]? |
| Officer Elbaum: | Hey, sir, who do want to work on the Johnson thing? |
| Officer: | [Unintelligible] |
| Officer Elbaum: | Okay.  Okay.  [Laughter] [Unintelligible]  What are we doing with this guy?  [Laughter] |

Upon information and belief, Officer Elbaum was speaking to Officer McDonald.

54.   Shelly Parham left a phone number with the dispatcher for a requested return call.

Ms. Parham's request that Marcus be provided his medication was ignored.  It was consciously

disregarded.  Ms. Parham made it clear through her choice of words, and the volume of and

inflection in her voice, that it was urgent that Marcus receive his medications to avoid him

committing suicide.  Marcus remained isolated, alone, and unmonitored, and Officer Elbaum

continued to act in a clearly subjectively and objectively reckless, and far more than unreasonable,

manner.

55.   At approximately 7:02 p.m., Officer Elbaum exited the book-in area.

Approximately five minutes later, at approximately 7:07 p.m., after complaining that he did not

get to finish eating dinner, Officer Elbaum chose to leave the police department to respond to a

comparatively minor issue (alleged theft of a speaker).  Officer Elbaum left the police department

with knowledge of Marcus's suicidal tendencies, and also left Marcus to fend for himself in dealing with such suicidal tendencies.  Officer Elbaum surely knew that Marcus would ultimately harm and/or kill himself, and Officer Elbaum choosing to leave the police station was a conscious decision to allow that to occur.  Marcus remained isolated, alone, and unmonitored.

56.    Moreover, upon information and belief, during the entire relevant time period described in this pleading, the City of Burkburnett did not have in place any video and/or audio monitoring equipment which captured Marcus' cell in a manner allowing him to be monitored and/or watched by any City of Burkburnett employees and/or police officers.  The City of Burkburnett consciously chose not to provide such monitoring equipment, even though it knew that the failure to observe suicidal and/or significantly mentally ill inmates would be violative of their constitutional rights.  The City of Burkburnett's policy of not securing and/or installing such monitoring equipment resulted in this case in Marcus being able to hang himself.  This is particularly troubling, in light of previous suicide attempts at that facility.  Obviously, the City of Burkburnett simply did not care.  It chose not to purchase equipment which would be relatively inexpensive as compared to the loss of life.  The City of Burkburnett's policy of not having such monitoring equipment shocks the conscience in light of the City of Burkburnett's knowledge of prior inmate attempted suicides and Marcus being kept in a cell, alone, and isolated, with his severe mental health issues.  Upon information and belief, the City of Burkburnett made a policy decision not to have audio and video monitoring equipment and chose to expend funds on other matters instead, and such decision was made either by the city council and/or the police chief as policymakers.  In fact, the City of Burkburnett obtained such a video monitoring system only after Marcus's death, and only when it did not have to pay a single penny for it.  Instead, the City obtained it pursuant to a grant.  This policy and decision was a moving force behind Marcus's death.

57.     At approximately 7:14 p.m., over thirty minutes after Marcus was locked into a jail cell, Officer McDonald went to the cell to check on Marcus. Officer McDonald did not decide to do so as a result of Burkburnett policy or his desire to act professionally and appropriately, but instead out of anger and irritation due to hearing Marcus moaning, crying, banging on the cell door, and loudly stating "help me." It was clear to Officer McDonald from the sounds and the crying that Marcus was distraught and, in conjunction with his known mental health history, on the verge of committing suicide. Officer McDonald asked Marcus what he needed, and Marcus asked what he was being arrested for. Officer McDonald told Marcus twice that he was going to jail. Being told as much, in the mental state in which Marcus found himself, cooped up and alone, and with seemingly no hope to a person with his mental health issues, sealed Marcus's fate.[3]

58.     Officer McDonald then left Marcus to his own devices and walked back to an office. However, he did not do so before closing the first door to the cell area, and then slamming the second door which provided access to the first door to the cell area. In fact, upon information and belief, Officer McDonald slammed the door so hard that the vibration knocked something off the wall or off of the door onto the floor (which Officer McDonald picked up). Officer McDonald then made a grunting, guttural noise demonstrating his anger and irritation that he had to be bothered with Marcus's problems. This was the last time anyone with the City of Burkburnett Police Department checked on and/or observed Marcus while he was in a cell, alive and alone, and it was the last time that Marcus was seen alive. Officer McDonald essentially sealed Marcus into his tomb, by shutting both doors, so that Officer McDonald would hopefully not need to be bothered with hearing Marcus's crying, moans, and pleas. However, when asked at his deposition

---

[3] Interestingly, neither Officer McDonald nor any of the other officers could cite an offense for which Marcus's conduct met all of the elements. Marcus was incarcerated for committing a purported offense that he never committed. Instead of explaining to Marcus that neither Officer McDonald nor any of his co-workers could match the offense for which Marcus was purportedly arrested to what actually occurred just before Marcus was arrested, he told Marcus that he was going to jail.

whether it would be more difficult to hear Marcus if he were to call out to Officer McDonald if both such doors were closed, Officer McDonald flatly testified, "I could still hear him." When asked how Officer McDonald knew that he could still hear him, he testified, "I just – I know I'd be able to hear him from the, the office." If one is to believe Officer McDonald's testimony, since Marcus continued making noises and saying things throughout the evening before his death, Officer McDonald ignored all such noise. Officer McDonald's deliberate indifference resulted in and caused Marcus's death.

59.     About nine minutes later, at approximately 7:23 p.m., Officer McDonald left the police department. He did so knowing that Marcus had pants on with a drawstring, with which he could commit suicide (as he had attempted three times before). Officer McDonald would later tell Lieutenant Lahoma Vaughn that he had checked on Marcus at approximately 7:30 p.m. Marcus remained isolated, alone, and unmonitored due to choices made by Officer Elbaum, Officer McDonald, Sergeant Leonard, and the City of Burkburnett.

60.     About twenty-five minutes after Officer Elbaum left the police department, he returned to the police department (at approximately 7:32 p.m.). Officer Elbaum made a conscious choice not to check on and/or monitor Marcus at that time. Instead, after waiting at least approximately five additional minutes after arriving at the police station (until approximately 7:37 p.m. according to City of Burkburnett records, or at approximately 7:45 p.m. according to Ranger Catlin), he returned Shelly Parham's call received about thirty to forty-five minutes prior. During that telephone call, though he needed no additional information to continue in his conscious disregard of Marcus's critical medical needs and need for reasonable accommodation, Shelly Parham provided even more information regarding Marcus's suicidal tendencies and the need for him to obtain medication to assist with such tendencies. The following is in substance a portion of that telephone conversation:

| | |
|---|---|
| Shelly Parham: | Yeah, I had called. My son is Marcus Johnson. |
| Officer Elbaum: | Yes. |
| Shelly Parham: | And I wanna know like what's gonna happen, because, well, he takes three different medications. They're psychosis medications. |
| Officer Elbaum: | Uh-huh. |
| Shelly Parham: | And he's not supposed to be without them. He takes them at night, then one is for like every so many hours. So, I didn't know. We live in Wichita, so. |
| Officer Elbaum: | Okay. He didn't have any medication on him whenever we . . . |
| Shelly Parham: | Yeah, he don't keep it on him, because I administer it to him, because he is, he's not really capable of keeping it, because he has, his IQ is 42 and he's in the MR range. He can't keep medication on him at all. He's not capable of taking the right amount or anything so, I give him his medication. |
| Officer Elbaum: | What is it that he's taking? |
| Shelly Parham: | He takes zyprexa, lithium, and clonidine. Those are the three he takes. He just got out of state hospital again. He's in and out of there, so. He's been, years, uh-huh, so. |
| Officer Elbaum: | Okay. |

61.     Ms. Parham also told Officer Elbaum that Marcus received Supplemental Security Income ("SSI") Social Security benefits. This indicated to Officer Elbaum that Marcus apparently had serious mental health issues, because Officer Elbaum had observed Marcus and could see that, from a physical perspective, he seemed readily mobile. Officer Elbaum knew that Marcus was not 65 years of age or older or blind (which are bases for the receipt of SSI benefits). Therefore, Officer Elbaum knew that Marcus must have been determined to be disabled as a result of mental health issues. This indicated to Officer Elbaum that Marcus was mentally disabled. The end of the conversation was in substance the following:

| | |
|---|---|
| Shelly Parham: | What about his medication? Do we need to bring it? How does that work, because he needs the medication? |
| Officer Elbaum: | Whenever I book him in over at County, I will notify them that he takes medication for his, I guess it's for bipolar disorder? |
| Shelly Parham: | No. He's actually got manic depression and he's got – |
| Officer Elbaum: | Well, that's bipolar. Bipolar is when – |

| | |
|---|---|
| Shelly Parham: | Well, he's got psychosis disorder and anger explosive disorder. He's – I have a paper that he's diagnosed with five different things, so. |
| Officer Elbaum: | At Helen Farabee? |
| Shelly Parham: | Yeah. It's through Helen Farabee and also Oklahoma, yeah. He's been diagnosed since he was nine, so. |
| Officer Elbaum: | Okay. |
| Shelly Parham: | I mean, really mentally I don't think he really knew that it was – like you said, that's an argument. We'll get an attorney. |
| Officer Elbaum: | Yeah. |
| Shelly Parham: | That's fine. I just know that he has a right to take his medication. I do know that. |
| Officer Elbaum: | Okay. Well, like I said, he'll get an opportunity to make a phone call when he gets to County. And he can, and then you'll just need to check the County website and find out what he – what his bond's gonna be. And if you want to go up there and post his bond to get him out of jail, you'll just need to contact Wichita County Jail. |
| Shelly Parham: | Okay. So when do they do that? The next day, or do they do it when he - |
| Officer Elbaum: | Tomorrow morning, tomorrow morning. |
| Shelly Parham: | Okay. |
| Officer Elbaum: | He'll see a judge tomorrow morning. I think the judge comes in around 9:00, and then he'll hear his case, and then he'll set a bond based on the charge, and then he'll have the opportunity to post bond if you want to get him out of jail. |
| Shelly Parham: | Okay. That's all I need to know. |
| Officer Elbaum: | Okay. |
| Shelly Parham: | Thanks. |
| Officer Elbaum: | All right, ma'am. |

Unfortunately, "tomorrow morning" never came for Marcus. Ms. Parham had informed Officer Elbaum that Marcus was a suicide risk and needed to take his medication, through tone, voice, and words. She made it evident and clear to Officer Elbaum that he and the City of Burkburnett had a serious situation on their hands. Officer Elbaum simply did not care and did not allow Shelly Parham to come to the jail and provide and/or administer Marcus's medication to him. Officer Elbaum consciously chose to disregard Marcus' clearly-established constitutional right to reasonable medical care (of which Ms. Parham seemed to be aware and which Officer Elbaum feigned unawareness). He chose to shirk, avoid, and disregard his duties as a State actor and as a

person who had chosen to arrest and incarcerate Marcus without providing to him any needed medical assistance. Officer Elbaum was unmoved and acted as a proverbial "stone wall" to Shelly Parham's desperate attempts to assist her suicidal son. He did so even after demonstrating during that telephone conversation, by interrupting Shelly Parham, his knowledge of "Helen Farabee" and the type of facility it was. Officer Elbaum was not confused in the least. He fully understood what he was faced with in incarcerating and not monitoring Marcus, and he chose to be deliberately indifferent.

62.     It is beyond belief that Officer Elbaum would make such conscious choices and decisions when Marcus's life was hanging in the balance. Unfortunately, due to Officer Elbaum's callous disregard for continued information regarding Marcus's suicidal tendencies, Marcus would never be transferred to the Wichita County jail.  Shelly Parham told Officer Elbaum that medication Marcus was taking was prescribed by Helen Farabee.  Helen Farabee is a well-known center that specializes in providing community-based treatment and support services for people with severe and persistent forms of mental illness, substance abuse, and intellectual and developmental disabilities.  Upon information and belief, Officer Elbaum knew this.  "Alarm bells" should have been going off in Officer Elbaum's head, although he needed no additional information to decide to appropriately monitor Marcus. Shelly told Officer Elbaum that Marcus was prescribed Zyprexa (an antipsychotic medication), Lithium (used to treat manic episodes of bipolar disorder), and Clonidine (used to treat attention deficit hyperactivity disorder).  Upon information and belief, Officer Elbaum knew this.  Even so, Officer Elbaum flatly notes in his statement, "I advised Parham that I would let the medical staff at the jail know about his current treatments." The thought of Officer Elbaum, being in the best position at that time to do something, simply shrugging off Marcus's medical needs and deferring to others, makes the reader of his statement want to rush into the jail and save Marcus. Officer Elbaum consciously disregarded

information received during the call and chose not to check on and/or monitor Marcus. He was deliberately indifferent. Officer Elbaum's inaction is beyond belief. Unfortunately, it is true. Officer Elbaum chose to allow Marcus to remain isolated, alone, and unmonitored.

63.    Officer Elbaum continued doing nothing comparatively important, continuing to be deliberately indifferent to Marcus's significant and life-threatening medical needs. Eerily, approximately two hours, four minutes after Marcus was put into a jail cell, and approximately one hour, twenty-nine minutes after anyone had checked on Marcus, at approximately 8:43 p.m., sounds can be heard in the audio portion of the audio-video recording (such sounds appearing to come from the jail cells where Marcus was kept). No one responded. No one attempted to help. No one checked on Marcus to see whether he was alright, or whether he was in the process of hanging himself. Upon information and belief, the sounds were those of Marcus attempting to or actually hanging himself, or preparing to do so. Once again, Officer Elbaum did nothing. Officer Elbaum's continued conscious disregard of Marcus' safety, his critical medical needs, and his suicidal tendencies would, and did, ultimately lead to and proximately cause Marcus' death.

64.    At approximately 8:58 p.m., Officer McDonald, Deputy Constable Jared Burchett, and Officer McDonald's ride-along (Ted Kwas) entered the police department. Officer Elbaum continued in his decision to do nothing. No one checked on Marcus even though he may have been deceased by that point. There was no one for any way to know whether he was deceased, because Officer Elbaum and everyone else at the City of Burkburnett Jail chose not to check on and/or monitor Marcus.

65.    Officer Leonard, in his written statement, wrote that he received a telephone call from Officer Elbaum at approximately 9:19 p.m. Officer Leonard alleges he was not on duty at that time. Officer Leonard wrote that Officer Elbaum told Officer Leonard that he needed assistance at the police station in completing the probable cause affidavit for Marcus's arrest.

Officer Elbaum's focus was apparently more on how to keep Marcus incarcerated than on assuring that Marcus did not harm himself. Officer Leonard indicated that he told Officer Elbaum that he would travel to the police station in his personal vehicle to assist.

66.     In their rush to judgment, it appears that City of Burkburnett police officers were not even certain of the alleged crime with which to charge Marcus in response to him being forced to provide an allegedly fake identification card. Officer Elbaum wrote in substance in his statement that, while working on an arrest report and probable cause affidavit for Marcus, he came to the belief that the elements of the alleged offense did not match the charge. Thus, he asked Officer McDonald for help. He also asked Deputy Constable Burchett for help as they looked at the charge. After those three officers were unable to match the elements of an offense with the purported reason that Marcus was arrested, they decided to call Officer Leonard for help. Officer Elbaum decided to call Officer Leonard because they were "struggling with wording the offense." The fact that three officers could not apparently match the elements of an offense with the purported reason that Marcus was arrested demonstrates either a significant level of incompetence, considering the simplicity of the alleged offense, or that Marcus should have never been arrested. The thought of four officers, standing around, looking at such a simple statute, and apparently realizing that Marcus had been arrested for a crime which he did not commit, while at the same time thinking of Marcus likely already deceased in his cell, is a mental picture that no one wants to see. It should have never happened, and it would not have happened if Officer Elbaum had simply done what he was supposed to have done. It also would have never happened if the City of Burkburnett had policies and training in place to continually observe inmates with serious mental conditions and/or suicidal tendencies.

67.     Officer Leonard also wrote, that approximately four minutes after receiving the 9:19 p.m. phone call from Officer Elbaum, he received a phone call from Officer McDonald.

Officer McDonald said that he needed immediate assistance at the police station due to Marcus hanging himself while in custody.

68.     At approximately 9:21 p.m., which was **over two hours after anyone last checked on and/or observed Marcus**, Officer McDonald finally decided to check on Marcus in his cell. This was approximately twenty-three minutes after Officer McDonald had returned to the police station. Amazingly, video shows Officer McDonald with Deputy Constable Burchett, with Deputy Constable Burchett thumbing through a book, still attempting to determine what, if anything, with which to charge Marcus. Officer McDonald then said that he intended to go back out on patrol, but he would first check on Marcus. Officer McDonald indicated in his statement that he had asked Officer Elbaum whether he had checked on his prisoner, and that Officer Elbaum flatly stated, "No." Regardless, when Officer McDonald went to the cell, he found what would not have surprised Officer Elbaum, Officer McDonald, or Sergeant Leonard – Marcus hanging in his cell (having committed suicide). Officer McDonald found Marcus facing away from the door with the drawstring for Marcus's pants tied around his neck and tied off on the cell bars. Officer McDonald yelled for other officers to call for medical assistance. Burkburnett Police Department Lieutenant Lahoma Vaughn, after later conducting an internal investigation, would write, **"There are no documented checks of [Marcus] by any officers from 19:14 hours through 21:21 hours, which is a conflict of department policy #114 (holding facility) and #110 (General Orders)."** (Emphasis added). It was also a blatant violation of Marcus's constitutional rights and of federal statutes referenced in this pleading.

69.     About one minute later, at approximately 9:22 p.m., Officer Elbaum finally chose to enter the jail cell area. It was too late for Marcus. No reasonable officer in the shoes of Officer Elbaum, knowing all that he knew, would have expected anything other than what police officers found when they entered the jail cell area. In fact, all reasonable police officers in the shoes of

Officer Elbaum would have expected to find exactly what they found.  Deputy Constable Burchett also entered the jail cells area, and paramedics were notified.  Deputy Constable Burchett pulled out his knife and cut the string with which Marcus had hung himself.  Someone felt for a pulse, and there was none.  Upon information and belief, Marcus had been deceased for at least approximately 30 minutes.  This was evidenced by the fact that someone checking for a pulse said that he was "cold," and that *rigor mortis* had set in.

 



70.     At approximately 9:23 p.m., police dispatch contacted Police Chief Ed Stahr. About two minutes later, at approximately 9:25 p.m., police dispatch contacted Lieutenant Vaughn.  Also, at about that same time, Officer McDonald contacted Detective Zellner.

71.     At approximately 9:26 p.m., paramedic Dan King and firefighter Chase Carter arrived at the police department.  About two minutes later, at approximately 9:28 p.m., paramedic Pat Hanlon arrived at the police department.  Sergeant Leonard arrived at the police department at about the same time.  Sergeant Leonard found what he should have expected to find – Marcus deceased as a result of suicide.  Sergeant Leonard entered the building wearing the hat he had apparently worn during the softball game he played while Marcus died.

72.     At approximately 9:35 p.m., Lieutenant Vaughn arrived at the police department. Approximately four minutes later, Chief Stahr arrived at the police department.  Chief Stahr at some point contacted City Manager Mike Whaley to inform him as to what had occurred.

73.    At approximately 9:40 p.m., Detective Johnny Zellner arrived at the police department.  About nine minutes later, at approximately 9:49 p.m. American Medical Response ("AMR") arrived at the police department.  Upon information and belief, paramedics who arrived were Curtis Martin, Kayla Sosa, and Becky Stouffer.  About two minutes later, at 9:51 p.m., Judge Viavattene pronounced Marcus as being deceased.

74.    About thirty minutes later, at approximately 10:21 p.m., Texas Ranger Catlin was notified for the first time.  Ranger Catlin ultimately conducted an investigation of what he termed a questionable custodial death.  Chief Stahr told Ranger Catlin that he was "going to find out anyway" – Marcus had stated during the book-in process that he was suicidal.  Chief Stahr also told Ranger Catlin that Marcus's mother had called dispatch several times, asking to bring Marcus's medications to Marcus, because Marcus had been off of his medications for a couple days.  Upon information and belief, Chief Stahr offered no excuses for his officers and the City because he knew that no excuses were appropriate.  Chief Stahr knew that his officers and the City of Burkburnett Police Department had failed in providing medical and mental health care to Marcus, and in protecting him, and further avoiding unconstitutional punishment of Marcus as a pretrial detainee.

75.    On the same date, Texas Municipal Police Association attorney Lance Wyatt called Ranger Catlin and told Ranger Catlin that Mr. Wyatt would be representing the police officers in the investigation.  Attorney Wyatt told Ranger Catlin that he could obtain a brief synopsis from the officers, but that attorney Wyatt wanted to be present when Ranger Catlin obtained statements.

76.    At approximately 10:42 p.m. (10:52 p.m. according to Ranger Catlin), Shelly Parham called the City of Burkburnett Police Department once again and wanted to know when Marcus would be transferred to Wichita County so that she could take to him his required medication.  She offered to drive to the Burkburnett jail to bring Marcus' medication to him.  She

spoke with dispatcher Liberty Billingsley during that call. Officer Billingsley informed Lieutenant Vaughn that Shelly Parham was on the phone. Shelly Parham had no clue what had occurred, although everyone at the police department knew. Medical personnel had already determined that Marcus could not be revived, and AMR had been cleared to leave the scene by a hospital emergency department physician. Lieutenant Vaughn wrote in a report supplement that Judge Nancy Viavattene had been notified and officers were awaiting her arrival (even though other records indicate that Judge Viavattene had pronounced Marcus as being deceased at approximately 9:51 p.m.).

77.     Lieutenant Vaughn then spoke with Shelly Parham. Lieutenant Vaughn told Shelly that she needed to speak with Shelly in person. Shelly, suspecting that something was wrong with Marcus, began to ask if he was okay and was alive. Shelly began to scream into the phone. Lieutenant Vaughn told Victor, Shelly's fiancé, during that call, that Marcus was no longer alive. Lieutenant Vaughn then told Victor that she was leaving the police station and driving to Shelly Parham's home to explain the situation and answer their questions.

78.     Information regarding the 10:42/10:52 p.m. call above was obtained substantially from the City of Burkburnett Police Department records. Such records do not, upon information and belief, include an 11:01 p.m. call from Shelly Parham to the Burkburnett Police Department. Shelly Parham asked what was going on. The City of Burkburnett Police Department put her on hold for several minutes, and then the call terminated. Moreover, according to Ranger Catlin, during the 10:42/10:52 p.m. call referenced above, Shelly Parham stated once again that she would bring Marcus' medications to Burkburnett. She stated that Marcus needed his medication, and once again asked if he was okay.

79.     Chief Stahr and Lieutenant Vaughn went to Shelly Parham's home in Wichita Falls. Lieutenant Vaughn asked Wichita Falls Police Department Lieutenant Kevin Folmar for

uniformed officers to respond to Ms. Parham's home.  When Lieutenant Vaughn arrived, she met with Wichita Falls Police Department officers and walked to Shelly Parham's residence. Lieutenant Vaughn informed Shelly and others that Marcus committed suicide using a drawstring from his pants to hang himself in his cell.  Shelly fell to the ground and said that she could not breathe.  Wichita Falls Police Department officers requested an ambulance.  Family members all began to ask questions at the same time, mostly, "Why weren't you watching him?"  They were expressing what laypeople knew, and what Officer Elbaum, Officer McDonald, and Sergeant Leonard as professionals knew – Marcus should have been continuously watched.  Anyone choosing not to watch Marcus, with information possessed by these officers and the City of Burkburnett Police Department, would show a complete and total conscious disregard, and deliberate indifference, for Marcus's health and safety, and ultimately his life.  Victor asked the police officers to leave, and Shelly asked that an ambulance not come to her home.

80.     Dallas County, through the Southwestern Institute of Forensic Sciences at Dallas (Office of the Medical Examiner) conducted an autopsy.  The Wichita Falls Embalming and Mortuary Service had responded to the scene and ultimately transported Marcus's body to Dallas. Janis K. Townsend-Parchman, M.D., medical examiner, wrote in her report, "It is my opinion that Marcus Johnson, a 22-year-old Latin male, died as the result of hanging, which was self-inflicted." The manner of death was listed as "suicide."  The related Cause of Death Report, also signed by Dr. Townsend-Parchman, listed the cause of death as hanging, and the manner of death as suicide. The Defendants' actions and/or inaction caused, proximately caused, and were the producing cause of Marcus's death.

81.     On or about March 11, 2016, Police Chief Stahr ordered an internal affairs investigation.  He asked Lieutenant Vaughn to head that investigation, writing in a letter to her:

On 03-10-2016 [ ] there was an inmate death in our holding facility. Please review all information in regards to this incident up to and including adherence to department policy and procedures. Please provide a report with the results of your investigation and any recommendations you may have.

Lieutenant Vaughn wrote a note to Chief Stahr, on March 21, 2016, writing in part that she had drafted letters to each officer on duty when Marcus was taken into custody to notify them of the internal investigation. She also wrote that she intended to "determine if department policy and procedures were followed" and report to Chief Stahr within fourteen days. She wrote letters to Sergeant Leonard, Officer McDonald, Officer Elbaum, and Officer Mullens.

82.     The City of Burkburnet Police Department, through Chief of Police Stahr and Lieutenant Vaughn, notified those four police officers of their rights related to the internal investigation. Chief of Police Stahr and Lieutenant Vaughn wanted to be sure that City of Burkburnett police officers were provided with required constitutional protection (unlike what was provided to Marcus). The City of Burkburnett Police Department had a preprinted form which it used to notify those officers of their constitutional rights related to internal investigation communications, and it included a City of Burkburnett mandate that the police officers not discuss any of the details of the investigation with anyone except a lawyer (who could further advise them of their constitutional rights). The title of the City of Burkburnett Police Department form included the phrase "Garrity Warning." A "*Garrity* warning" arises from the United States Supreme Court case styled *Garrity vs. New Jersey* (1967). In *Garrity*, a police officer was required to make a statement or else be fired. The police officer was then prosecuted for the statement. The United States Supreme Court found that the police officer had been deprived of his Fifth Amendment right to silence. The City of Burkburnett police department gave the following *Garrity* warning to its four officers:

**CITY OF BURKBURNETT**
**POLICE DEPARTMENT**

**Internal Investigation**
**Garrity Warning And Confidentiality Order**

You are advised that you are being questioned as part of an internal investigation by the City of Burkburnett. You will be asked to answer questions directed and related to the performance of your official duties and/or fitness for office. You are entitled to all rights and privileges guaranteed by the laws and Constitution of this State and the United States Constitution, including the right not to be compelled to incriminate yourself.

If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to disciplinary action up to and including the termination of your employment. If you do answer, neither your statement nor any information or evidence that is gained by reason of such statements can be used against you in any subsequent criminal proceedings, except as allowed by law. However, these statements may be used against you in relation to subsequent disciplinary charges. Your statements can also be used against you in a perjury prosecution arising out of the giving of a false statement.

The confidentiality and integrity of this investigation must be maintained. You are hereby ordered not to discuss any of the details of this investigation with anyone including but not limited to witnesses, prospective witnesses, or any member or non-member of this Department. The only exception to this order is that if you wish, you may consult a lawyer to advise you of your constitutional rights and/or any other legal concerns that you may have regarding this proceeding.

The City of Burkburnett Police Department was well aware of the United States Constitution, providing to its own officers with a warning regarding their constitutional right to silence. Thus, upon information and belief, it and its officers were aware of due process rights afforded to Marcus under the Fourteenth Amendment to the United States Constitution, which included the right to receive reasonable medical care, the right to be protected, and the right not to be punished as a pretrial detainee. Chief Stahr and the City of Burkburnett chose to have a policy or practice whereby inmates with suicidal tendencies and severe medical needs would not be continuously monitored, and they chose to implement that policy and/or practice by failing to buy what would have been relatively inexpensive audio and video monitoring equipment. This policy or practice led to and proximately caused, and was the moving force behind, Marcus's death. The City of Burkburnett Police Department protected its officers' right to remain silent but failed to protect what was to Marcus a far greater right – his right to live.

83.     After the City of Burkburnett internal investigation concluded, Chief Stahr wrote a letter of suspension to Officer Elbaum. Amazingly, Officer Elbaum was suspended for only one

day without pay for knowing, egregious, and unacceptable violation of Marcus's constitutional

and statutory rights (resulting in Marcus's death).



## POLICE DEPARTMENT
### CITY OF BURKBURNETT
208 East Fourth Street
Burkburnett Texas 76354
Phone:(940)569-2231   Fax: (940) 569-1102



CHIEF OF POLICE
ED STAHR

To:  Officer Daniel Elbaum

April 14, 2016

Subject:  Letter of Suspension

On 03-10-2016, an incident occurred in our holding facility that resulted in the death of Marcus Johnson.  I instructed Lt. Vaughn to open an internal investigation into this incident and all materials relevant to this matter.

Lt. Vaughn interviewed all officers present on second shift patrol on 03-10-2016. Lt. Vaughn also reviewed all reports, vehicle and building videos available in regards to this incident.  After reviewing LT. Vaughn's report, I have noted the following.

You were the transporting officer and booking officer for Mr. Johnson.  In reviewing the details of the incident, it appears you were given information by the victim that he had attempted suicide in the recent past.  You were also given information by his mother of potential mental issues by public service call to the department.  I believe the proper course of action on your part would have been to share this information with the other officers of your shift, along with following the established Burkburnett Police Department Operating Guideline as it relates to the holding facility.  I also feel there were no extenuating circumstances that prevented you from following the written departmental policy in regards to you checking the prisoner at least every 30 minutes.

You violated BPOG to wit:  #114 Section <u>Supervision of Detainees</u> Item #1 Detainees will be observed every 30 minutes.  Detainees who are security risks should be under closer observation and may require more frequent observation. This classification includes not only detainees who are violent but also those who are suicidal or mentally ill or demonstrate unusual or bizarre behavior.

For that reason I am placing you on One (1) day suspension without pay.

Chief Ed Stahr
Burkburnett Police Department

I acknowledge I have received a copy of this letter.

Officer Daniel Elbaum

84.    Chief Stahr also reprimanded Officer McDonald in writing.  Chief Stahr noted in

part that Officer McDonald was in charge of the shift after Sergeant Leonard ended his shift.  Chief

Stahr also noted that Officer McDonald was responsible to ensure that appropriate observations of

Marcus were made.



**POLICE DEPARTMENT**
CITY OF BURKBURNETT
208 East Fourth Street
Burkburnett Texas 76354
Phone:(940)569-2231  Fax: (940) 569-1102



CHIEF OF POLICE
ED STAHR

To:  Officer Matt McDonald

April 14, 2016

Subject:  Letter of Reprimand

On 03-10-2016, an incident occurred in our holding facility that resulted in the
death of Marcus Johnson.  I instructed Lt. Vaughn to open an internal
investigation into this incident and all materials relevant to this matter.

Lt. Vaughn interviewed all officers present on second shift patrol on 03-10-2016.
Lt. Vaughn also reviewed all reports, vehicle and building videos available in
regards to this incident.  After reviewing LT. Vaughn's report, I have noted the
following.

You were the ranking officer in charge of the shift once Sgt. Leonard left for the
rest of the shift.  Under the established Burkburnett Police Department
Guidelines, the ranking officer is also responsible to ensure that observations are
made of any/all prisoners in the holding facility.  I have taken into account you did
check the prisoner yourself during the shift, however you did not make sure this
was continued throughout the shift according to the Departmental Policy.

You violated BPOG to wit:  #114 Section Supervision of Detainees Item #1&3 #1-
Detainees will be observed every 30 minutes.  Detainees who are security risks
should be under closer observation and may require more frequent observation.
This classification includes not only detainees who are violent but also those who
are suicidal or mentally ill or demonstrate unusual or bizarre behavior. #3- It is
the responsibility of the ranking officer on shift to ensure that observations are
made.  An officer will make the observations.

For that reason, I am placing this letter of reprimand in your personnel file.

Chief Ed Stahr
Burkburnett Police Department

I acknowledge I have received a copy of this letter.

Officer Matt Mcdonald

 

 

85.     Finally, Chief Stahr wrote what he termed a "Letter of Council" [sic] to Sergeant

Leonard.  Interestingly, Chief Stahr noted the difficulty police officers had determining the alleged

crime with which they would attempt to have Marcus charged for the alleged fake identification

card.  Chief Stahr also noted that such confusion caused Marcus to be in custody of the City of

Burkburnett longer than he should have been.  The letter seems to cap a description of a series of

events showing a police department acting ineptly with conscious disregard for Marcus's welfare.

On 03-10-2016, an incident occurred in our holding facility that resulted in the death of Marcus Johnson.  I instructed Lt. Vaughn to open an internal investigation into this incident and all materials relevant to this matter.

Lt. Vaughn interviewed all officers present on second shift patrol on 03-10-2016. Lt. Vaughn also reviewed all reports, vehicle and building videos available in regards to this incident.  After reviewing LT. Vaughn's report, I have noted the following.

You were the Sergeant over second shift for the beginning of this incident, I have taken into account your scheduled time off beginning at approximately 1910.  I have reviewed Lt. Vaughn's report along with your responses to the events and have noted several areas of concern.  The following are the items of concern.

1. The female subject was allowed to stay on her cell phone.  This is also not good officer safety tactics for a variety of reasons jeopardizing all officers' safety along with the other subjects at the scene.

2. As the supervisor of the shift it is your responsibility to make sure your officers are aware of any action that needs to be taken.  There seemed to be a large amount of debate/confusion on what to charge the subject with.  This caused the subject to be in our custody a longer amount of time.  You seemed to try by public service several times to clarify this, without success. As a supervisor you are responsible for your shift and are held to a higher standard is this regard, to insure the officers of your shift receive clarification when needed, and the detainees are transported in a timely manner.

For that reason, I am placing this letter of counciling in your personnel file.  I am also requiring you to take the following actions.

1. At the earliest date possible enroll in additional supervisor training with prior approval by the Chief of Police or his designee.

2. Hold mandatory meetings with all members of second shift in regards to BPOG #114 Holding Facilities.  Also hold mandatory meetings with all members of second shift on proper officer safety tactics as it relates to pat downs for weapons.  These meetings will be coordinated and approved by the Chief of Police or his designee.

Chief Ed Stahr
Burkburnett Police Department


I acknowledge I have received a copy of this letter.

Sergeant Zac Leonard

86.    The internal investigation was woefully inadequate to the extent it determined that

neither Officer McDonald nor Sergeant Leonard were aware of information on the Booking

Information form for Marcus and/or did not hear Officer Elbaum's comments directed to them,

including that Marcus was a "pansy."  Clearly, the City of Burkburnett had access to the police

officers involved, portions of the police station at which the events occurred, and audio and video recordings provided to Plaintiffs' counsel.  However, even having such evidence, the City was alleges that it was unable to piece together events as the Plaintiffs have done to determine that the three Defendant officers, with identical knowledge within five minutes of the time Marcus was initially put into a cell alone and unmonitored, were all deliberately indifferent to the receipt of such information.  However, the City was well aware that Officer McDonald and Sergeant Leonard possessed information sufficiently identical to that possessed by Officer Elbaum and, to ratify the conduct of both senior officers, chose not to suspend them as it suspended Officer Elbaum (for a woefully inadequate one-day period of time).  The City only ordered Sergeant Leonard to obtain training regarding suicide prevention after Marcus's death, even though it allegedly found, as compared to Officer McDonald and Officer Elbaum, Sergeant Leonard's action and/or inaction was less egregious (with which the Plaintiffs disagree).  This internal investigation evidences the City's ratification of the actions of all three officers.  The one-day suspension, while being some action taken by the City after Marcus's death, is so *de minimus* as to be in substance no action whatsoever.  The one-day suspension of Officer Elbaum was a "wink and a nod" designed solely for publicity purposes.  The fact that the City took not even such *de minimus* action against Officer McDonald and/or Sergeant Leonard, being senior officers, is further evidence of the City's ratification of all three officers' actions (and thus an independent basis for *Monell* liability).

87.     The City of Burkburnett position description for a police officer requires the officer to be familiar with current state law and city ordinances, along with Department and city employee policies.  A police officer must be state-certified, with a Basic Certificate, and have the ability to work with others and understand citizens and culture that affect the Burkburnett area.  An officer must have one year of prior experience.  The City of Burkburnett also requires a police officer to have the ability to work under pressure and "high stressful situations."

88.     The City of Burkburnett position description for a police sergeant requires the sergeant to "[o]versee general operations of patrol officers." A police sergeant also must have "[c]onsiderable knowledge of [D]epartmental procedures, rules and regulations," and also "[c]onsiderable knowledge of applicable federal, state and local laws and ordinances, including laws of arrest." The position description also requires a sergeant to have "[c]onsiderable knowledge of the principles, practices and procedures" of his or her "area of assignment." A police sergeant must also have the ability to quickly analyze situations and determine a proper course of action. The City of Burkburnett moreover requires a police sergeant to have an Intermediate Peace Officer License and at least four prior years of continuous service as a police officer with the City of Burkburnett Police Department. A police sergeant's duties include "responsibility for the supervision of and coordination of sworn and civilian personnel." A sergeant must also have "advanced knowledge of the procedures and practices of the shift to which assigned and the ability to direct and supervise subordinates under normal and emergency circumstances." A police sergeant will perform his or her work with "considerable independence and in accordance with applicable laws, ordinances and regulations under the general supervision of a superior officer."

89.     On March 16, 2016, Chief Stahr asked Detective Zellner to attempt to make contact with the person who contacted the police department and which had led to Marcus's arrest. Detective Zellner listened to the recording of the telephone conversation in which the person reported the incident, and it was apparent to Detective Zellner that the reporting party (Stephanie) was being deceptive. Detective Zellner noted that she first said "my house" and then quickly said "I mean my neighbor's house." The dispatcher during that call had asked for "Stephanie's" name several times, but she avoided providing it.

Factual Allegations: Spoliation/Destruction of Audio and Video Recordings

90.     On Thursday, March 17, 2016, at approximately noon, City of Burkburnett Detective Donald Osborn arrived at the law firm of Taylor-Olson-Adkins-Sralla-Elam, LLP at 6000 Western Place, Suite 200, Fort Worth, Texas to deliver evidence regarding Marcus's death. Detective Osborn alleged in his statement that he handed a thumb drive containing photographs, video evidence, and call logs of the incident to attorney Wayne Olson. Attorney Olson signed a Chain of Custody form, and Detective Osborn indicated that he left all of the evidence and the Chain of Custody form with Attorney Olson. Detective Osborn also indicated that he retained a copy of the Chain of Custody form to be kept with the case file at the City of Burkburnett Police Department.

91.     It should be beyond dispute that the City of Burkburnett, through one or more of its police officers and/or employees, destroyed critical video and audio recordings. This has been pointed out to the City's lawyer, who asserted that he has produced all videos which the City had in its possession. The Plaintiffs will show at trial, or possibly before trial, clear and unambiguous evidence that the City, through its police officers and/or employees, destroyed audio-video recordings which, suspiciously, involved a time period including that during which Marcus likely killed himself. Therefore, the court should craft an appropriate spoliation instruction for the jury or, in the alternative, take such action as is legal and just, whether before or during trial.

Factual Allegations: Prior Suicide Attempts

92.     This is not the first time the City of Burkburnett Police Department had an issue with a suicidal prisoner, and it has disclosed other incidents. On October 21, 2011, the City of Burkburnett Police Department arrested a Frank Snyder. Mr. Snyder had allegedly been exposing himself in public. Mr. Snyder had also allegedly been walking on East 3rd Street, heading toward

I-44, jumping of vehicles.  He was then observed walking on an old abandoned section of roadway heading toward the Red River.  These were clear signs of erratic behavior, mental illness, and/or an intent to commit suicide.

93.     The City of Burkburnett, when providing copies in response to an open records request, apparently redacted what Mr. Snyder answered when being asked, during book-in at the police station, whether he was suicidal, homicidal, or delusional.  Interestingly, it makes little sense to ask someone who is delusional whether they are delusional.  A police officer should be trained to recognize a potentially delusional person and not simply ask a question to which an accurate response may likely be impossible.  Regardless of the answer, which was removed from the document produced to the Plaintiffs' lawyer in this case, the City of Burkburnett Police Department placed Mr. Snyder in cell M1, removed blankets from the cell, and placed them on the floor outside the cell on the opposite wall.  Upon information and belief, Mr. Snyder had indicated that he was suicidal, and the City of Burkburnett was attempting to remove items from his cell with which he could commit suicide.

94.     On the same date, police officers responded to the police department regarding Mr. Snyder making what they believed to be "lots of strange noises from the cell."  When they arrived, they determined that Mr. Snyder was able to obtain one of the blankets and was laying on the bed covered up with it.  Officer Hamlin observed a piece of the blanket hanging from the top bar of the cell.  Once again, in documents received by the Plaintiffs' attorney, the City of Burkburnett apparently redacted certain information.  The document reads, "Snyder stated he had [information redacted] and then called out for officers to help.  Snyder stated he was barely able to get himself down from his makeshift [information redacted]."  Upon information and belief, Mr. Snyder had indicated that he had attempted to hang himself and was barely able to get himself down from his makeshift noose.  The City of Burkburnett's law firm apparently redacted additional information

related to that incident. However, upon information and belief, the City of Burkburnett Police Department then removed Mr. Snyder from his cell for the purpose of protecting him and keeping him from committing suicide. Officers asked that medics be dispatched to the jail to assist Mr. Snyder, so that he could ultimately be medically screened for, upon information and belief, suicidal tendencies.

95.     Thus, the City of Burkburnett had been aware for years of the risk of jail pre-trial detainees committing suicide. The City of Burkburnett was aware that, if screening and/or pre-arrest actions of a detainee indicated the detainee might harm himself or herself, the City of Burkburnett should take action to avoid such an occurrence. The City of Burkburnett knew that it must provide reasonable medical care to such persons, which would include appropriate observation, and reasonable accommodations.

96.     On January 16, 2014, the City of Burkburnett Police Department had another, upon information and belief, apparent attempted suicide in one of its jail cells. Officer Barnes was doing a cell check on what were at the time four male prisoners. He looked through a window and observed a male prisoner, Earl Ray-Shane Bolf, doing something which was, once again, redacted from documents provided to the Plaintiffs' attorney in response to an open records request. Upon information and belief, Mr. Bolf had hung himself or was attempting to hang himself with a shirt. Officer Barnes then yelled for Officer McDonald (upon information and belief, the same Officer McDonald involved in Marcus' death) and Sergeant Hogue and ran to get keys to the hallway and cell. Officers Barnes and McDonald entered the cell, and Officer McDonald lifted Mr. Bolf higher into the air so that Officer Barnes could grab his shirt. The shirt allegedly then came loose. Mr. Bolf was then lowered and ordered to strip his remaining clothes. When the police department called paramedics to evaluate Bolf due to the pressure and compression of something which was,

once again, redacted by the City of Burkburnett attorneys, paramedic Skinner indicated that Mr. Bolf should be transported to an emergency hospital room for further evaluation.

Factual Allegations: Suicides in Jails

97.     Jail suicides, as the Defendants knew before incarcerating Marcus Johnson, are a huge problem in the United States.  One-thousand fifty-three (1,053) people died in local jails in 2014, three-hundred seventy-two (372) died as a result of suicide.  The Defendants also knew when incarcerating Marcus that most jail suicides occur by hanging, with prisoners using objects available to them as ligatures.  Prisoners commonly use bed linens, clothing (including drawstrings), telephone cords, and trash bags.  The Texas Commission on Jail Standards ("TCJS") specifies use of a screening form for suicide and medical/mental/developmental impairments.  The screening form was revised before Marcus was incarcerated to achieve, as one of three goals, the creation of an objective suicide risk assessment with clear guidance for front-line personnel as to when to notify their supervisors and/or mental health providers and magistrates.  The TCJS indicates that intake screening "is the first step and is crucial to determine which inmates require more specialized mental health assessment."  Moreover, "Unless inmates are identified as *potentially* needing mental health treatment, they will not receive it."  The TCJS also notes that purposes of intake screening are to enable correctional staff to triage those who may be at significant risk for suicide; identify prisoners who may be in distress for a mental health disorder/psychosis or complications from recent substance abuse; and assist with the continuity of care of special-needs alleged offenders.  The TCJS requires that an intake screening form be completed for all inmates immediately upon admission into a jail facility.  Further, staff should perform additional screenings when they have information that an inmate has developed mental

illness, or the inmate becomes suicidal, at any point during the inmate's incarceration. A jail must maintain any such additional screening forms in a prisoner's file.

98.     Suicides were not a novel occurrence and/or unknown issue to the Defendants. They were well-aware of the risk, and in Marcus's case, the certainty of suicide. They were deliberately indifferent to this certainty, and Marcus died as a result.

<u>Factual Allegations: Certain City Policies, Practices, and Customs</u>

99.     In addition to any other City policies, practices, and customs mentioned in this pleading, policies, practices, and customs in this section of this pleading were a moving force behind Marcus's death. The City of Burkburnett Police Department Chief of Police, in this case Chief Stahr, is according to the City of Burkburnett's Holding Facility policy "solely responsible for the management of the holding facility." That policy also indicates that day-to-day operation of that facility is the responsibility of the ranking police officer on duty. When the City of Burkburnett refers to its Holding Facility, it is referring to the jail in which Marcus was incarcerated as a prisoner. The Holding Facility policy which was, upon information and belief, effective at the time Marcus was incarcerated, had an original effective date of December 1, 2013 and was signed by Ed Stahr as Chief of Police. The document also indicates that it is Guideline #114. The document charges all supervisors and officers with responsibility for enforcement of the Holding Facility procedures. That document includes several policies, some relevant portions of which are listed below.

100.     Security and Control Policy 1 reads, "Officers will not enter the holding facility alone unless they are monitored by either audio or visual means or have at least one other officer present. The dispatcher will monitor the audio until the officers reappear after putting the detainee

in a cell. This policy demonstrates the physical isolation of the prisoner cells, including the cell in which Marcus was incarcerated.

Supervision of Detainees Policy 1 reads:

Detainees will be observed every 30 minutes. Detainees who are security risks should be under closer observation and may require more frequent observation. This classification includes not only detainees who are violent but also those who are suicidal or mentally ill or demonstrate unusual or bizarre behavior. All observations will be logged with the dispatcher.

Supervision of Detainee Policy 3 reads, "It is the responsibility of the ranking officer on shift to ensure that these observations are made. An Officer will make the observations." Supervision of Detainee policy 1, instituted by Chief Stahr, is insufficient and does not meet medical or constitutional muster regarding pre-trial suicidal detainees such as Marcus.

101.    Over twenty-five years ago, in November 1991, the Texas Commission on Jail Standards published the Guide for Development of Suicide Prevention Plans. Even that long ago, when society and medical professionals as a whole knew much less than they have learned over the last few years, the Commission recommended continuous observation for high risk, acutely suicidal inmates who had attempted suicide. Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 25 years ago (in 1992, unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established. In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child. Although the mother did not prevail, Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit, regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. **Other municipalities should also take heed of the tragic**

**consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**

**What we learn from the experiences of Henderson County is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice;** that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation.

So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

The City of Burkburnett was put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution. The law was clearly established with exacting specificity, and the Defendants were charged with knowledge of it. Thus, the City's ambiguous thirty-minute policy does not pass constitutional muster and was a moving force behind Marcus's death.

102. The City also, as a policy decision, chose not to purchase clothing which would be appropriate for prisoners with self-harm tendencies. The City knew that it could obtain clothing from law enforcement vendors which would be appropriate for prisoners to wear if there is a likelihood that such prisoners would harm themselves. Such clothing would not have drawstrings and otherwise be constructed and manufactured so that a prisoner cannot utilize the clothing to

form a ligature.  The City's refusal to purchase such clothing was a moving force behind Marcus's death.  It is clear that the City desires to continue with this policy, because as late as December 2017, well after Marcus's death, it still had not purchased any such clothing.  In fact, one of its police officers testified at her deposition that the City at times will use donated clothing if an inmate needs to change into some other type of clothing.  The City simply does not care.  This policy, continuing long after Marcus's death, shows blatant deliberate indifference.

103.    Moreover, the City of Burkburnett does not require any of its police officers who have charge over prisoners in its jail to be jailers licensed and/or certified through the Texas Commission on Law Enforcement ("TCOLE").  TCOLE licensed and/or certified jailers receive jail-specific education, and such education assists people with charge over prisoners to perform their duties competently and intelligently.  The City of Burkburnett simply did not care whether any of its police officers had such licensure and/or certification, and it still did not have such jailers as late as December 2017.  This policy was a moving force behind Marcus's death.

104.    Further, the City of Burkburnett chose not to have any policy in place as to the minimum number of police officers that must be in the building in which its prisoners were housed.  This policy was in place at the time of Marcus's death, and it was still in place in late 2017.  Thus, if a dispatcher is the only person in the jail building at the time one or more prisoners are housed in the building, if there is any issue with a prisoner while all officers are in the field, the prisoner will not receive assistance unless and until an officer can be recalled from the field.  Thus, a prisoner could hang himself or herself, or otherwise cause harm to himself or herself (or another prisoner), long before a police officer could intervene.  This issue is particularly compounded in that it is the City's policy that, if a dispatcher is the only person at the police station at the time, he or she is not to go into a prisoner's cell to intervene regarding such matters.  This policy, and

specifically allowing officers referenced in this pleading to leave the jail facility on the night that

Marcus died, was a moving force behind Marcus's death and violation of his constitutional rights.

Factual Allegations: Media Coverage

105.   The blatant constitutional violations described by this pleading were so clear that

they gained media attention and the attention of at least one disability rights organization.   The

obviousness of the conduct in which the Defendant officers should have engaged was apparent

event to lay people.

## √hy weren't you watching him?'

### onitoring ·urkburnett :e at issue

**stopher Collins**
annett.com
533

 is part two of
irt article detail-
:takes made by the

Burkburnett Police Depart-
ment in the suicide of an in-
mate at the city's jail.

At 9:21 p.m. on March
10, it had been two hours
since any officer had seen
Marcus Johnson alive.
The 22-year-old man had
been booked that evening
into Burkburnett's city's
jail, which serves as a
temporary holding cen-
ter for prisoners awaiting

transfer to the larger
Wichita County Jail.

Documents obtained by
the Times Record News
through a state open re-
cords request show that
Burkburnett police offi-
cer Matthew McDonald
went to check on John-
son, finding that Johnson
had hanged himself from
the bars of his jail cell us-
ing the drawstring of his

pants.

McDonald called for
help. Officer Daniel El-
baum and a constable who
happened to be at the jail
performed CPR on John-
son while waiting for an
ambulance to arrive.

It was too late. Johnson
was dead.

Both   Elbaum   and

**See POLICE, 6A**

## Burkburnett police actions studied

### ■ Inmate's suicide prompts look at mistakes

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

This is part one of a two-
part article detailing mis-
takes made by the Burkbur-
nett Police Department in

the suicide of an inmate at
the city's jail.

Burkburnett police offi-
cers committed a series of
errors on March 10, from
the time they responded
to a disturbance call that
evening to the time they
found 22-year-old Marcus
Johnson dead, hanging in
a jail cell.

The mistakes were re-
vealed in an internal inves-
tigation report obtained by

the Times Record News
through an open records
request. Documents show
a police department in a
"state of confusion," com-
pounded by a lack of lead-
ership and non-adherence
to rules regarding the
treatment of prisoners.

The investigation found
that a Burkburnett police
sergeant "left the officers
on duty in a state of con-
fusion," which "probably

extended Johnson's stay
in the holding facility."
Another officer was found
to have denied Johnson the
opportunity to take his an-
tipsychotic medication,
despite being told by John-
son that he suffered from
several mental disorders
and had tried to commit
suicide just three weeks
earlier.

After being left alone
and unmonitored in a jail

cell for two hours, an of-
ficer found Johnson had
hanged himself to death
using the drawstring of
his pants.

One officer, Daniel El-
baum, was suspended for
one day in connection with
the incident. Another offi-
cer, Matt McDonald, was
reprimanded, and a super-
visor, Sgt. Zac Leonard,

**See POLICE, 6A**

# Burkburnett officer suspended

■ **Punishment comes after inmate's death**

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

A Burkburnett police officer was suspended for one day after an inmate at the city's jail hanged himself earlier this year, documents indicate.

Another officer received a letter of reprimand in connection with the March 10 death of 22-year-old Marcus Johnson, according to internal documents obtained Wednesday by the Times Record News through a state open records request.

Johnson was arrested by Burkburnett police that evening after authorities were called to the scene of a disturbance on South Avenue B. It was determined that Johnson was carrying a fake ID. He was handcuffed and booked into the city jail on a forgery charge.

Despite being told that Johnson had attempted suicide in the past and that he had "mental issues," police jailed Johnson and did not adequately monitor him while he was being held in a cell.

The probe showed that Officer Daniel Elbaum violated a city statute by not checking on the prisoner at least every 30 minutes.

**See JAIL, 6A**

---

**Times Record News**    **Thursday, October 13, 2016**
**Section B**

# Local

# Group investigating Burk jail suicide

■ **Disability Rights Texas gathers info on death**

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

A quasi-governmental organization that has been designated the state's mental health advocate has opened an investigation into the death of a mentally ill man in Burkburnett police custody.

An open records request submitted by Disability Rights Texas to the city of Burkburnett this year shows the group is gathering documents in connection to the suicide of prisoner Marcus Johnson, who hanged himself in a jail cell after police refused to allow him to take his antipsychotic medication in March.

Johnson reportedly suffered from a number of mental illnesses, among them bipolar disorder. He was jailed on a felony forgery charge after being in possession of a fake ID.

One Burkburnett police officer was suspended for a day because of the death. Another officer received a letter of reprimand and a third was sent a letter of counseling. The Texas Rangers opened an investigation, but documents do not show that an

investigator recommended criminal charges for any of the officers involved.

The Times Record News previously reported Johnson's death was preceded by several police errors, including a violation of jail procedures and an unwarranted refusal to let Johnson take his medication.

Disability Rights Texas is part of a "national network of protection and advocacy organizations" that aims to secure the rights of people with disabilities,

according to its website. The nonprofit agency was created by Congress and is federally designated.

Federal law gives the organization authority to investigate "incidents of abuse and neglect of individuals with mental illness," the Texas Attorney General's Office wrote this month in a letter to the city of Burkburnett. The city had requested an opinion from the AG's office when Disability Rights Texas requested information about Johnson's death — the city

argued it should be allowed to withhold a portion of those documents.

The office ruled that Disability Rights Texas must be provided with some of the requested information because it had "probable cause to believe" that Johnson had been neglected or abused while in police custody.

Disability Rights Texas did not return a Times Record News call Wednesday to discuss the status of its investigation.

---

# Burk jail death with DA's office

■ **DPS sends suicide case for review**

**By Christopher Collins**
ccollins@gannett.com
940-763-7533

The Texas Department of Public Safety has forwarded the results of

its investigation into the death of a man inside the Burkburnett jail this year to the Wichita County District Attorney's Office for its consideration.

DPS Sgt. John Gonzalez told the Times Record News the agency completed its investigation into the suicide of Marcus Johnson late last week, sending the case to prosecutors, who

may decide to convene a grand jury.

After being left alone and unmonitored in a jail cell for two hours on March 10, Johnson was found by police hanged to death from the drawstring of his pants.

An internal investigation — conducted separately from the DPS probe — found that three officers

acted inappropriately in the incident. One Burkburnett police officer, Daniel Elbaum, was found to have denied Johnson the opportunity to take his antipsychotic medication, despite being told by Johnson and his mother that he suffered from several mental disorders and had tried to

**See DEATH, 6A**

---

14th Amendment Due Process Claims Under 42 U.S.C. § 1983:
Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

106.     In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him.   *Id.* at 2470.   The Court was determining the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original).   The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in excessive force cases, and that the officer's subjective awareness was irrelevant. *Id.*  The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

107.     The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472.   Instead, "courts must use an objective standard." *Id* at 2472-73.   "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473.   Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding of the offending police officers for an episodic claim but instead instructed all federal courts to analyze officers' conduct on an objective reasonability basis.   There is no reason to treat pretrial detainees' other rights arising under the 14th Amendment's due process clause – such as the right to receive reasonable medical care, the right to be protected from harm, and the right not to be punished – differently.

108.     It appears that this standard is now the law of the land.   In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983.   *Id.* at 418.   The court

wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.[4]

---

[4] Circuit Judge Graves wrote: I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, –– U.S. ––––, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately.

109.     The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id*. Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, over twenty years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).  Thus, the trail leads to only one place – an objectively unreasonableness standard, with no regard for officers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  There should be no subjective state of mind and/or deliberate indifference standard applied.  The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

<u>Cause of Action Against Daniel C. Elbaum, Matthew C. McDonald, and Zachary D. Leonard
Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right
to Reasonable Medical Care as a Pretrial Detainee (Episodic Act or Omission)</u>

110.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Daniel C. Elbaum, Matthew C. McDonald, and Zachary D. Leonard are liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to reasonable medical care guaranteed by the 14th

Amendment to the United States Constitution.  Pre-trial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  Officer Elbaum, Officer McDonald, and Zachary D. Leonard acted and failed to act under color of state law at all times referenced in this pleading.  Officer Elbaum, Officer McDonald, and Zachary D. Leonard wholly or substantially ignored Marcus's suicidal tendencies and his obvious serious medical needs, and they were deliberately indifferent to those medical needs.  Officer Elbaum was not just aware, but well-schooled and thoroughly knowledgeable of Marcus's suicidal impulses due to multiple communications regarding those impulses, as well as the need for Marcus to take medication related to those impulses and his serious mental health issues.  He gained this knowledge through several direct communications with Marcus and Marcus's mother – Shelly Parham.    The other officers were aware of this information through observation and/or communication by the Booking Information form and/or orally from Officer Elbaum.  Marcus had a troubled and distraught demeanor while at the jail, and this demeanor together with all other information regarding prior suicides and his need for medication indicated Marcus's clear and unambiguous intent to kill himself.    Thus, these officers had subjective knowledge of the substantial risk of suicide and responded with deliberant indifference to that risk.  They were aware of the excessive risk to Marcus's health or safety and was aware of facts from which an inference could be drawn of serious harm (and they in fact drew that inference).    In fact, based on what occurred, it was more than an inference to these officers.  It was blatantly apparent.  These officers violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.  Marcus, as a pretrial detainee, had a clearly established right to receive reasonable medical care.  This right included the right to be continuously and appropriately monitored.  This right also included the right to have removed from his cell known items which are commonly used by suicidal inmates to kill

themselves, such as the drawstring in Marcus's pants.

111.    In the alternative, these officers' conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to the determination of the constitutional violation set forth in this section of this pleading.  The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause.  *Id* at 2470-71.  Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause.  *Id*.  Since such constitutional protections flow from the same clause, the analysis of what it takes to prove such constitutional violations should be identical.

112.    These three officers are not entitled to qualified immunity.  Their denial of reasonable medical care, total disregard for Marcus's health and safety, and total disregard for Marcus's suicidal tendencies and propensity to hurt himself caused, proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).

113.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas constitution, common law, and all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they

seek recovery from these officers:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses;

- funeral expenses; and

- exemplary/punitive damages.

114.   Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson. The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum, Officer McDonald, and Sergeant Leonard. If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, these three officers' actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- loss of companionship and society that she would have received from her son, Marcus; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed

violation of Marcus's constitutional rights. These three officers' actions and inaction showed a reckless or callous disregard of, or indifference to, Marcus's rights and safety. Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988. These three officers should be jointly and severally liable for any judgment because, among potentially other reasons, they caused indivisible damages and jointly acted in depriving Marcus of his constitutional rights.

### Cause of Action Against Daniel C. Elbaum, Matthew C. McDonald, and Zachary D. Leonard Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right to be Protected from Harm as a Pretrial Detainee (Failure-to-Protect Claim) (Episodic Act or Omission)

115. In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Daniel C. Elbaum, Matthew C. McDonald, and Zachary D. Leonard are liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to be protected from harm guaranteed by the 14th Amendment to the United States Constitution. Officer Elbaum, Officer McDonald, and Sergeant Leonard acted and failed to act under color of state law at all times referenced in this pleading. Officer Elbaum, Officer McDonald, and Sergeant Leonard wholly or substantially ignored Marcus's suicidal tendencies and his obvious serious medical needs, and they were deliberately indifferent to those medical needs. Officer Elbaum was not just aware, but well-schooled and thoroughly knowledgeable of Marcus's suicidal impulses due to multiple communications regarding those impulses, as well as the need for Marcus to take medication related to those impulses and his serious mental health issues. He gained this knowledge through several direct communications with Marcus and Marcus's mother – Shelly Parham. The other officers were

aware of this information through observation and/or communication by the booking information form and/or orally from Officer Elbaum. Marcus had a troubled and distraught demeanor while at the jail, and this demeanor together with all other information regarding prior suicides and his need for medication indicated Marcus's clear and unambiguous intent to kill himself. Thus, these officers had subjective knowledge of the substantial risk of suicide and responded with deliberant indifference to that risk. They were aware of the excessive risk to Marcus's health or safety and was aware of facts from which an inference could be drawn of serious harm (and they in fact drew that inference). In fact, based on what occurred, it was more than an inference to these officers. It was blatantly apparent. These officers violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents. Marcus, as a pretrial detainee, had a clearly established right to be protected from harm. This right included the right to be continuously and appropriately monitored. This right also included the right to have removed from his cell known items which are commonly used by suicidal inmates to kill themselves, such as the drawstring in Marcus's pants.

116.    In the alternative, these officers' conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to the determination of the constitutional violation set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id.* at 2470-71. Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what it takes to prove such constitutional violations should be identical.

117.     These three officers are not entitled to qualified immunity.  Their failure to protect

Marcus, total disregard for Marcus's health and safety, and total disregard for Marcus's suicidal

tendencies and propensity to hurt himself caused, proximately caused, and was a producing cause

of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-

law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).

118.     The United States Court of Appeals for the Fifth Circuit has held that using a state's

wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to

42 U.S.C. § 1983.  Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal

claims being asserted by and through Victor Hines III as Independent Administrator, seek all

remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code §

71.021), the Texas constitution, common law, and all related and/or supporting caselaw.

Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they

seek recovery from these three officers:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses;

- funeral expenses;  and

- exemplary/punitive damages.

119.     Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages

available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act

(Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the

wrongful death of her biological and legal son – Marcus Johnson.  The damages suffered by Ms.

Parham were caused and/or proximately caused by Officer Elbaum, Officer McDonald, and

Sergeant Leonard.  If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983

action and obtain remedies and damages provided by Texas law. Therefore, these three officers' actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- loss of companionship and society that she would have received from her son, Marcus; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Marcus's constitutional rights. These three officers' actions and inaction showed a reckless or callous disregard of, or indifference to, Marcus's rights and safety. Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988. These three officers should be jointly and severally liable for any judgment because, among potentially other reasons, they caused indivisible damages and jointly acted in depriving Marcus of his constitutional rights.

### Cause of Action Against Daniel C. Elbaum, Matthew C. McDonald, and Zachary D. Leonard Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right not to be Punished as a Pretrial Detainee (Episodic Act of Omission)

120.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Daniel C.

Elbaum, Matthew C. McDonald, and Zachary D. Leonard are liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right not to be punished guaranteed by the 14th Amendment to the United States Constitution.  Pre-trial detainees are entitled not to be punished at all, according to the United States Supreme Court.  Officer Elbaum, Officer McDonald, and Sergeant Leonard acted and failed to act under color of state law at all times referenced in this pleading.  Officer Elbaum, Officer McDonald, and Sergeant Leonard wholly or substantially ignored Marcus's suicidal tendencies and his obvious serious medical needs, and they were deliberately indifferent to those medical needs.  Officer Elbaum was not just aware, but well-schooled and thoroughly knowledgeable of Marcus's suicidal impulses due to multiple communications regarding those impulses, as well as the need for Marcus to take medication related to those impulses and his serious mental health issues.  He gained this knowledge through several direct communications with Marcus and Marcus's mother – Shelly Parham.  The other officers were aware of this information through observation and/or communication by the Booking Information form and/or orally from Officer Elbaum.  Marcus had a troubled and distraught demeanor while at the jail, and this demeanor together with all other information regarding prior suicides and his need for medication indicated Marcus's clear and unambiguous intent to kill himself.  Thus, these officers had subjective knowledge of the substantial risk of suicide and responded with deliberant indifference to that risk.  They were aware of the excessive risk to Marcus's health or safety and was aware of facts from which an inference could be drawn of serious harm (and they in fact drew that inference).  In fact, based on what occurred, it was more than an inference to these three officers.  It was blatantly apparent.  These three officers violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.  Marcus, as a pretrial detainee, had a clearly established right not to be punished.  This right included the right to be continuously and

appropriately monitored. Even so, these three officers refused to provide needed prescription drugs to Marcus, failed to monitor him, placed him in an isolated cell, and allowed him to retain a drawstring by which he could hang himself. These three officers' refusal to allow Marcus to obtain treatment and his placing Marcus into an isolated cell, unmonitored, for hours, while Marcus was suicidal and not in his right mind, constituted punishment. While the 8th Amendment to the United States Constitution prohibits cruel and unusual punishment of convicted inmates, the Constitution prohibits punishment at all of pretrial detainees. Even so, these officers unconstitutionally punished Marcus.

121.    In the alternative, these officers' conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to the determination of the constitutional violation set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id.* at 2470-71. Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, both flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what it takes to prove such constitutional violations should be identical.

122.    These three officers are not entitled to qualified immunity. Their punishing of Marcus, through denying reasonable medical care, total disregard for Marcus's health and safety, total disregard for Marcus's suicidal tendencies and propensity to hurt himself, and decision to place Marcus in an isolated and unmonitored cell to allow him to commit suicide, caused, proximately caused, and was a producing cause of Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent

Administrator of the Estate of Marcus Johnson).

123.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas constitution, common law, and all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seek recovery from these three officers:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses;

- funeral expenses;  and

- exemplary/punitive damages.

124.     Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson.  The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum, Officer McDonald, and Sergeant Leonard.  If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, these three officers' actions caused, were the proximate cause of, and/or were the producing cause of the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- loss of companionship and society that she would have received from her son, Marcus; and;

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Marcus's constitutional rights. These three officers' actions and inaction showed a reckless or callous disregard of, or indifference to, Marcus's rights and safety. Moreover, all Plaintiffs in this case seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988. These three officers should be jointly and severally liable for any judgment because, among potentially other reasons, they caused indivisible damages and jointly acted in depriving Marcus of his constitutional rights.

<u>Cause of Action Against City of Burkburnett Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right as a Pretrial Detainee to Reasonable Medical Care (Conditions of Confinement)</u>

125.   In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Burkburnett is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to reasonable medical care guaranteed by the Fourteenth Amendment to the United States Constitution. Claims in this section are typically referred to as "conditions of confinement" claims. According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context

of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers.   Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for the official policy or practice Section 1983 claim is objective. Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015).  Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  The City of Burkburnett acted or failed to act under color of state law at all relevant times.  The City of Burkburnett's custom(s) or policy(ies) caused Marcus's death and the Plaintiffs' resulting damages.  Chief Stahr was a policymaker for the City at all relevant times, and he was the chief policymaker at all such times for the police department (and the jail at which Marcus was incarcerated).  In the alternative, the City Council for the City of Burkburnett was the chief policymaker at all times.  Chief Stahr's and the City's failure to adopt, upon information and belief, a prisoner suicide policy was an intentional choice.  This policy should include a broad number of topics and specific policies within it.  Thus, the City was deliberately indifferent regarding its prisoners with suicidal tendencies.  It had in place a general policy, referenced above, of checking on inmates every thirty minutes.  The policy read that prisoners with suicidal tendencies "may require more frequent observation."  This is in substance no policy at all, because it does not specify the frequency.  This was a deliberate choice to violate constitutional rights, in light of at least two prior suicide attempts in the jail, by hanging, and Judge Goldberg's 1992 admonition.  This policy, as well as the failure to adopt an appropriate policy, and related custom, were the moving forces behind the violation of Marcus's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.

126.    Also, upon information and belief, the City did not adequately train its police officers to provide reasonable medical care to prisoners.  A document received in an open records request indicates that training was done after Marcus died.  This was far too late for Marcus.  Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with at least two prior known attempted suicides) showed the callous and uncaring attitude of the City regarding rights of suicidal prisoners.  The City did not require suicide prevention training either before or after Marcus's death.  The failure to require it after Marcus's death is a ratification of the manner in which the three Defendant police officers acted.  Oddly, Chief Stahr required only Sergeant Leonard to obtain such suicide prevention training.  Such requirement was like shooting a BB gun at a rushing bull.  While it might have *de minimis* effect, it would do nothing to change the culture of the City of Burkburnett Police Department regarding suicide prevention.

127.    The City also consciously chose not to purchase audio and video monitoring equipment which would allow it to monitor pretrial detainees in the cell block in which Marcus was incarcerated, including prior suicidal inmates and Marcus.  The City knew that inmates would attempt to commit suicide in its cells, because it had happened on at least two and possibly more occasions prior to Marcus successfully committing suicide.  The City's chose, policy, and practice of not securing, maintaining, and using such equipment showed deliberate indifference and conscious disregard for Marcus' constitutional rights.  The City policy was to utilize funds for things other than audio and video monitoring equipment in the jail, and this was consistent with its practice of failing to monitor suicidal and/or severely mentally ill detainees.

128.    The City of Burkburnett's action, inaction, policies, and practices caused, proximately caused, and were a producing cause of, and were the moving force behind, Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted

by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).  Those actions and inaction violated Marcus's constitutional rights.

129.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), Texas constitution, common law,  and/or all related and/or supporting caselaw.  Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seek recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses; and

- funeral expenses.

130.    Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson.  The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum.  If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, the Defendants' actions caused, were the proximate cause of, and/or were the producing cause of, and were the moving force behind, the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;  and

- loss of companionship and society that she would have received from her son, Marcus.

Moreover, all Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

### Cause of Action Against City of Burkburnett Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right as a Pretrial Detainee to be Protected from Harm (Failure-to-Protect Claim) (Conditions of Confinement)

131.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Burkburnett is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right to protection from harm guaranteed by the Fourteenth Amendment to the United States Constitution. Claims in this section are typically referred to as "conditions of confinement" claims. According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the isolated actions of individual policymakers. Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for the official policy or practice Section 1983 claim is objective.  Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015).  Pretrial detainees are

entitled to be protected from harm.  The City of Burkburnett acted or failed to act under color of

state law at all relevant times.  The City of Burkburnett's custom(s) or policy(ies) caused Marcus's

death and the Plaintiffs' resulting damages.  Chief Stahr was a policymaker for the City at all

relevant times, and he was the chief policymaker at all such times for the police department (and

the jail at which Marcus was incarcerated).  In the alternative, the City Council for the City of

Burkburnett was the chief policymaker at all times.  Chief Stahr's and the City's failure to adopt,

upon information and belief, a prisoner suicide policy was an intentional choice.  This policy

should include a broad number of topics and specific policies within it.  Thus, the City was

deliberately indifferent regarding its prisoners with suicidal tendencies.  It had in place a general

policy, referenced above, of checking on inmates every thirty minutes.  The policy read that

prisoners with suicidal tendencies "may require more frequent observation."  This is in substance

no policy at all, because it does not specify the frequency.  This was a deliberate choice to violate

constitutional rights, in light of at least two prior suicide attempts in the jail, by hanging, and Judge

Goldberg's 1992 admonition.  This policy, as well as the failure to adopt an appropriate policy,

and related custom, were the moving forces behind the violation of Marcus's rights and showed

deliberate indifference to the known or obvious consequences that constitutional violations would

occur.

132.    Also, upon information and belief, the City did not adequately train its police

officers to protect prisoners from harm.  A document received in an open records request indicates

that training was done after Marcus died.  This was far too late for Marcus.  Importantly, regarding

deliberate indifference, the failure to conduct such training before someone died (such as with at

least two prior known attempted suicides) showed the callous and uncaring attitude of the City

regarding rights of suicidal prisoners.  The City did not require suicide prevention training either

before or after Marcus's death.  The failure to require it after Marcus's death is a ratification of the

manner in which the three Defendant police officers acted.   Oddly, Chief Stahr required only Sergeant Leonard to obtain such suicide prevention training.   Such requirement was like shooting a BB gun at a rushing bull.   While it might have *de minimis* effect, it would do nothing to change the culture of the City of Burkburnett Police Department regarding suicide prevention.

133.   The City also consciously chose not to purchase audio and video monitoring equipment which would allow it to monitor pretrial detainees in the cell block in which Marcus was incarcerated, including prior suicidal inmates and Marcus.   The City knew that inmates would attempt to commit suicide in its cells, because it had happened on at least two and possibly more occasions prior to Marcus successfully committing suicide.   The City's chose, policy, and practice of not securing, maintaining, and using such equipment showed deliberate indifference and conscious disregard for Marcus' constitutional rights.   The City policy was to utilize funds for things other than audio and video monitoring equipment in the jail, and this was consistent with its practice of failing to monitor suicidal and/or severely mentally ill detainees.   This is consistent with Chief Stahr's determination not to allow officers to use body cameras on a long-term basis. A couple or so body cameras were available to be used by police officers for a period of time but, upon information and belief, Chief Stahr determined that they were not to be used any longer. Upon information and belief, this was because Chief Stahr did not want full documentation of officers' interaction with members of the public.

134.   The City of Burkburnett's action, inaction, policies, and practices caused, proximately caused, and were a producing cause of, and were the moving force behind, Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson).   Those actions and inaction violated Marcus's constitutional rights.

135.   The United States Court of Appeals for the Fifth Circuit has held that using a state's

wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), Texas constitution, common law,  and/or all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seek recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses; and

- funeral expenses.

136. Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code). She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson. The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum, Officer McDonald, and Sergeant Leonard. If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law. Therefore, the Defendants' actions caused, were the proximate cause of, and/or were the producing cause of, and the moving force behind, the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of

her son, Marcus;  and

- loss of companionship and society that she would have received from her son, Marcus.

Moreover, all Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42

U.S.C. §§ 1983 and 1988.

### Cause of Action Against City of Burkburnett Under 42 U.S.C. § 1983 for Violation of Marcus Johnson's 14th Amendment Due Process Right as a Pretrial Detainee not to be Punished (No Punishment) (Conditions of Confinement)

137.    In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, Defendant City of

Burkburnett is liable to the Plaintiffs, pursuant to 42 U.S.C. § 1983, for violating Marcus's right

not to be punished guaranteed by the Fourteenth Amendment to the United States Constitution.

Claims in this section are typically referred to as "conditions of confinement" claims.  According

to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section

1983 claims based on official municipal policies is less stringent that the deliberate indifference

standard used for Section 1983 claims based on the isolated actions of individual policymakers.

Whereas the deliberate indifference standard for the actions of individual policymakers requires

subjective awareness of the inmate's serious medical condition, the deliberate indifference

standard for the official policy or practice Section 1983 claim is objective.  Such an objective

standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015).  Pretrial detainees are

entitled not to be punished at all, according to the United States Supreme Court.  The City of

Burkburnett acted or failed to act under color of state law at all relevant times.  The City of

Burkburnett's custom(s) or policy(ies) caused Marcus's death and the Plaintiffs' resulting

damages. Chief Stahr was a policymaker for the City at all relevant times, and he was the chief policymaker at all such times for the police department (and the jail at which Marcus was incarcerated). In the alternative, the City Council for the City of Burkburnett was the chief policymaker at all times. Chief Stahr's and the City's failure to adopt, upon information and belief, a prisoner suicide policy was an intentional choice. This policy should include a broad number of topics and specific policies within it. Thus, the City was deliberately indifferent regarding its prisoners with suicidal tendencies. It had in place a general policy, referenced above, of checking on inmates every thirty minutes. The policy read that prisoners with suicidal tendencies "may require more frequent observation." This is in substance no policy at all, because it does not specify the frequency. This was a deliberate choice to violate constitutional rights, in light of at least two prior suicide attempts in the jail, by hanging, and Judge Goldberg's 1992 admonition. This policy, as well as the failure to adopt an appropriate policy, and related custom, were the moving forces behind the violation of Marcus's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.

138. Also, upon information and belief, the City did not adequately train its police officers to take adequate measures to assure that prisoners like Marcus were not punished through refusing to provide medical care, refusing to allow administration of prescription medications necessary for appropriate mental health, and placing inmates in an isolated and unmonitored cell for hours when they had clear, recent, and contemporaneous suicidal tendencies. A document received in an open records request indicates that training was done after Marcus died. This was far too late for Marcus. Importantly, regarding deliberate indifference, the failure to conduct such training before someone died (such as with at least two prior known attempted suicides) showed the callous and uncaring attitude of the City regarding rights of suicidal prisoners. It had in place a general policy, referenced above, of checking on inmates every thirty minutes. The policy read

that prisoners with suicidal tendencies "may require more frequent observation." This is in substance no policy at all, because it does not specify the frequency. This was a deliberate choice to violate constitutional rights, in light of at least two prior suicide attempts in the jail, by hanging, and Judge Goldberg's 1992 admonition. This policy, as well as the failure to adopt an appropriate policy, and related custom, were the moving forces behind the violation of Marcus's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.

139.    The City also consciously chose not to purchase audio and video monitoring equipment which would allow it to monitor pretrial detainees in the cell block in which Marcus was incarcerated, including prior suicidal inmates and Marcus. The City knew that inmates would attempt to commit suicide in its cells, because it had happened on at least two and possibly more occasions prior to Marcus successfully committing suicide. The City's chose, policy, and practice of not securing, maintaining, and using such equipment showed deliberate indifference and conscious disregard for Marcus' constitutional rights. The City policy was to utilize funds for things other than audio and video monitoring equipment in the jail, and this was consistent with its practice of failing to monitor suicidal and/or severely mentally ill detainees.

140.    The City of Burkburnett's action, inaction, policies, and practices caused, proximately caused, and were a producing cause of, and were the moving force behind, Marcus's death and other damages suffered by Marcus, Shelly Parham, and Marcus's heirs-at-law (asserted by Victor Hines III as Independent Administrator of the Estate of Marcus Johnson). Those actions and inaction violated Marcus's constitutional rights.

141.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, the heirs-at-law and the Estate of Marcus Johnson, such federal

claims being asserted by and through Victor Hines III as Independent Administrator, seek all remedies and damages available under the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), Texas constitution, common law,  and/or all related and/or supporting caselaw. Therefore, Marcus's estate (and his heirs at law) suffered the following damages, for which they seek recovery:

- Marcus's conscious physical pain, suffering, and mental anguish experienced by him prior to his death;

- medical expenses; and

- funeral expenses.

142.    Plaintiff Shelly D. Parham, individually, also seeks all remedies and damages available to her for the 42 U.S.C. § 1983 violations pursuant to the Texas Wrongful Death Act (Chapter 71 of the Texas Civil Practice and Remedies Code).  She seeks those damages due to the wrongful death of her biological and legal son – Marcus Johnson.  The damages suffered by Ms. Parham were caused and/or proximately caused by Officer Elbaum.  If Marcus had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas law.  Therefore, the Defendants' actions caused, were the proximate cause of, and/or were the producing cause of, and were the moving force behind, the following damages suffered by Shelly D. Parham:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;  and

- loss of companionship and society that she would have received from her son, Marcus.

Moreover, all Plaintiffs seek an award of reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

Causes of Action Against City of Burkburnett for Violation of
Americans with Disabilities Act and Rehabilitation Act

143.   In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, the City of Burkburnett is liable to the Plaintiffs pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act.   Upon information and belief, the City of Burkburnett has been and is a recipient of federal funds.   Therefore, it is covered by the mandate of the federal Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose. Further, Title II of the ADA applies to the City of Burkburnett and has the same mandate as the Rehabilitation Act.   Claims under both the Rehabilitation Act and ADA are analyzed similarly.

144.   The City of Burkburnett jail/holding facility is a "facility" for purposes of both the rehabilitation and ADA, and the jail's operation comprises a program and services for Rehabilitation Act and ADA purposes.   Marcus Johnson was a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of his major life activities (and thus disabled). Marcus was also discriminated against by reason of his disability.

145.   A majority of circuits have held, for purposes of Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with

deliberate indifference.  The Fifth Circuit has declined to follow the majority view.  Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

146.    The City of Burkburnett's failure and refusal to accommodate Marcus's mental disabilities while in custody violated the Rehabilitation Act and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Marcus's death and the Plaintiffs' damages.

147.    The City of Burkburnett's violations of the Rehabilitation Act and the ADA included its failure to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Marcus's mental disabilities.  These failures and refusals, which were intentional, proximately caused Marcus's death and the Plaintiffs' damages.  Because Marcus's death resulted from the City of Burkburnett's intentional discrimination against him, the Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.  The Plaintiffs seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of the Plaintiffs' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and the ADA, and the Plaintiffs also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

## Conditions Precedent

148.    All conditions precedent to assertion of the Plaintiffs' claims have occurred.

## Use of Documents at Trial or Pretrial Proceeding

149.    The Plaintiffs intend to use at one or more pretrial proceedings and/or at trial all documents produced by the Defendants in this case in response to written discovery requests, with

initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

## Jury Demand

150.    The Plaintiffs demanded a jury trial in state court prior to removal of this case, and the Plaintiffs paid the appropriate fee.  The Plaintiffs' jury demand continues through removal, and despite this being an amended complaint, never ceased.  The Plaintiffs once again hereby demand a jury trial on all issues which may be tried to a jury.

## Prayer

151.    For these reasons, the Plaintiffs ask that the Defendants be cited to appear and answer, and that the Plaintiffs have judgment for damages within the jurisdictional limits of the court and against the Defendants, jointly and severally, as legally applicable, for:

a)    actual damages of and for Shelly D. Parham individually including but not necessarily limited to the following:

- loss of services that she would have received from her son, Marcus;

- expenses for Marcus's funeral;

- past mental anguish and emotional distress resulting from and caused by the death of her son, Marcus;

- future mental anguish and emotional distress resulting from and caused by the death of her son, Marcus; and

- loss of companionship and society that she would have received from her son, Marcus;

b)    actual damages of and for the Estate of Marcus Johnson through its Independent Administrator Victor Hines III (ultimately the heirs-at-law of Marcus Johnson) including but not necessarily limited to the following:

- conscious pain and suffering; and

- funeral expenses;

c)   exemplary/punitive damages for all Plaintiffs from Daniel Elbaum, Matthew McDonald, and Zachary D. Leonard;

d)   reasonable and necessary attorneys' fees for all Plaintiffs through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

e)   court costs and all other recoverable costs;

f)   prejudgment and postjudgment interest at the highest allowable rates; and

g)   all other relief, legal and equitable, general and special, to which the Plaintiffs are entitled.


Respectfully submitted,

Law Offices of Dean Malone, P.C.


By: /s/ T. Dean Malone

T. Dean Malone
Texas State Bar No. 24003265
dean@deanmalone.com
Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:   (214) 670-9904

Attorneys for the Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2018 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

Ashley D. Dierker
Taylor, Olson, Adkins, Sralla, & Elam, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107

Daniel R. Barrett
Taylor, Olson, Adkins, Sralla, & Elam, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107

Wayne K. Olson
Taylor, Olson, Adkins, Sralla, & Elam, L.L.P.
6000 Western Place, Suite 200
Fort Worth, Texas 76107

Joe Tooley
Tooley Law
510 Turtle Cove #112
Rockwall, Texas 75087

/s/ T. Dean Malone
T. Dean Malone